[No. 52160–3. En Banc. June 12, 1986.]

FRED JORDAN, *Appellant,* v. THE CITY OF OAKVILLE, ET AL, *Respondents.*

*Andrews & Moore* and *Gary E. Andrews,* for appellant.

*Brown, Edwards, Lewis & Janhunen,* by *Curtis M. Janhunen,* for respondents.

ANDERSEN, J.—

## FACTS OF CASE

Fred Jordan, plaintiff herein, sued the mayor, city council and the City of Oakville alleging that his employment as an Oakville police officer was improperly terminated. The trial court granted a summary judgment dismissing his complaint. His appeal to the Court of Appeals was transferred to this court.[1]

Oakville is a small community located near the stalled Satsop nuclear plant construction project. When construction work was underway on the project in the late 1970's, Oakville entered into an agreement with the Washington Public Power Supply System (WPPSS) by which the latter agreed to provide funds to help with the anticipated impact of the new nuclear power plant on Oakville. Some of these funds were earmarked for law enforcement purposes.

Prior to the receipt of the WPPSS funds, Oakville had employed only one part–time police officer, Al Brandt. After receiving the WPPSS funds, Oakville originally added one full–time police officer, James Young, to the police force; Brandt then became the part–time chief of police. Later, Oakville hired a second full–time officer, John Mullic. When Officer Mullic was sent to basic law enforcement school, the plaintiff was hired on July 7, 1981 as a temporary replacement pending Mullic's anticipated return in September of that year. Mullic failed the law enforcement course, however, and in August 1981 submitted his resignation. The plaintiff thereupon continued his temporary employment as Oakville's second full–time police officer.

The city government of Oakville consists of a mayor and a 5–member city council. While the mayor has the authority to hire and fire individual police officers, it is the council which determines the number of police officers that will be on the police force each year. The city council has several committees, including a 3–member budget committee. In October and November of 1981, this committee met

---

[1]RAP 4.3.

approximately three times to discuss and recommend a budget for 1982. During those meetings, it was pointed out that because of problems concerning the Satsop nuclear construction project, WPPSS funding would likely terminate in 1983, thus depriving Oakville of a sizeable portion of its revenue. In addition, in November of 1981 a proposed levy to raise additional taxes was rejected by Oakville voters. The budget committee thereupon unanimously recommended that the Oakville police force include only one full–time officer for 1982. All three budget committee members testified in their depositions that their recommendation (to be later voted upon by the full 5–member council) was based entirely on financial considerations.

After this unanimous budget committee action, the mayor sent the following letter to the plaintiff terminating his employment:

December 2, 1981

Fred H. Jordan
McCleary, WA

Dear Mr. Jordan:
   In regards to the hiring of another policeman to take the place of John Mullic, the Council has decided that because of the failure of the [November 1981 tax levy] that the police department is one area that will have to be cut back. Therefore, we will not be hiring on a second policeman for the coming year. We would like you to continue as a patrolman for Oakville for the remainder of the year making December 31, 1981 your last day.
   We regret having to resort to these measures and would like you to know that we appreciate the excellent job you have done while working here in Oakville.
Sincerely,
CITY OF OAKVILLE
/s/ Archie E. Inmon
Archie E. Inmon
Mayor

Although the letter indicates that as of December 2, 1981, "the Council [had] decided" to cut back to one full–time police officer, the full city council did not actually

consider this matter until December 14 when it next met. The plaintiff alleges that at the meeting the mayor accused him of having "gone over to the other side" (*i.e.,* associating with political opponents of the mayor), and said he didn't want his police officers "monkeying around in politics". The plaintiff alleges that the mayor also remarked upon plaintiff's supposed inability to hold a job for very long. Three of the city council members testified in their depositions that the mayor did make such remarks or remarks of similar import.

The city council members were divided on the proposal to reduce the Oakville police force to one full–time officer. The financial advantages of such a move were debated; the final council vote was 3 to 2 in favor of the reduction, with all three budget committee members again supporting the proposal. The council voted to leave sufficient money in the 1982 budget to hire a second full–time officer if that later proved necessary. However, no other officer was ever hired with these funds. Accordingly, plaintiff's employment was terminated as of December 31, 1981, less than 6 months after his being hired as a temporary employee.

At no time during plaintiff's employment did Oakville maintain a civil service system for its police officers.

Plaintiff's appeal presents five principal issues. Since we are reviewing the dismissal of his complaint by an order of summary judgment, we will consider all evidence and reasonable inferences therefrom in the light most favorable to him.[2]

## ISSUES

ISSUE ONE. By not maintaining a civil service system for its police officers, did the City of Oakville violate the state civil service law for police officers, RCW 41.12?

ISSUE TWO. Did the defendants violate the Open Public Meetings Act of 1971, RCW 42.30?

ISSUE THREE. Did the plaintiff have a defamation cause

---

[2]CR 56; *Davis v. Niagara Mach. Co.,* 90 Wn.2d 342, 348, 581 P.2d 1344 (1978).

of action against the mayor?

ISSUE FOUR. In terminating the plaintiff's employment, did the defendants violate his right to due process of law?

ISSUE FIVE. Were the plaintiff's First Amendment free speech and association rights violated?

## DECISION

ISSUE ONE.

CONCLUSION. Because of the small size of Oakville's police force, the law did not require it to maintain a civil service system for its police officers. The plaintiff was a temporary city employee and his employment was terminable at will.

RCW 41.12 governs the establishment of civil service for city police officers. It provides:

> The provisions of this chapter shall have no application . . . to cities having a police force of not more than two persons including the chief of police.

RCW 41.12.010 (part). It further provides:

> There is hereby created in every city, town or municipality except those referred to in RCW 41.12.010, having fully paid policemen a civil service commission . . .

RCW 41.12.030 (part). The term "fully paid policemen" is then defined in RCW 41.12.220 to include "officers and policemen" who are paid regularly by the City and devote their whole time to police duty.

The question becomes whether, under these statutes, Oakville was required to establish a civil service system for its police officers. We hold that it was not. In interpreting statutes, we endeavor to ascertain and give effect to the legislative intent and purpose expressed in the act. The act must be construed as a whole and, if possible, its various provisions harmonized.[3]

The civil service statutes in question, by their express terms, apply only to cities having a police force of "more than two persons including the chief of police"[4] *and*

---

[3] *Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 730, 696 P.2d 1222 (1985).

[4] RCW 41.12.010.

"fully paid policemen".[5] Construing these provisions together, they only require cities to establish civil service if they have a police force consisting of three or more fully paid police officers. Since it is undisputed that at all times relevant to this action, Oakville had only two fully paid policemen and a part–time chief of police, Oakville was not required to maintain civil service for its police officers. The trial court was correct when it so ruled.[6]

The plaintiff was hired as a temporary police officer and had been on the Oakville police force for less than 6 months. The duration of his employment was indefinite. Generally speaking, an employment contract, indefinite as to duration, is terminable at will by either the employer or the employee.[7] While there are exceptions to this rule, none of them are applicable here.[8] The plaintiff was not covered by civil service and, as a temporary employee, could be terminated at will.

ISSUE TWO.

CONCLUSION. The plaintiff has not presented evidence sufficient to create a genuine issue of fact to support his claim that the defendants violated the Open Public Meetings Act of 1971. Summary judgment for the defendants on that issue was also proper.

The plaintiff relies solely on the termination letter he received from the mayor to support his claim in this regard. The letter indicated that as of December 2, 1981, "the Council [had] decided" to terminate his employment. The plaintiff argues that since the full council did not vote on this matter until December 14, 1981, the letter must have referred to a prior unlawful meeting of the city council at

---

[5]RCW 41.12.030.

[6]*See also* AGO 53–55–24 (1953). *But cf.* AGO (July 18, 1939).

[7]*Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 223, 685 P.2d 1081 (1984).

[8]*Thompson*, at 233.

which his termination was discussed.[9]

Uncontroverted evidence in the record clearly establishes, however, that the mayor's letter was in reference to the action of the council's 3–person budget committee, which unanimously recommended that the Oakville police force be cut back to one full–time police officer. With three city council members voting for this action, its passage by the full 5–person council was predictable and the mayor cannot be said to have acted improperly by giving the plaintiff early notice of his year–end termination.

Both the budget committee meeting and the city council meeting were open to the public. No other evidence was presented that plaintiff's termination was discussed at any nonpublic meeting and, therefore, plaintiff's Open Public Meetings Act of 1971 claim also fails.

ISSUE THREE.

CONCLUSION. The plaintiff did not establish a prima facie case as to each of the essential elements of a defamation cause of action, thus, it was not error to grant summary judgment for the defendants as to that issue.

■ *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124, 73 L. Ed. 2d 1339, 102 S. Ct. 2942 (1982) holds:

> Under our cases, a defamation plaintiff must show four essential elements: [1] falsity, [2] an unprivileged communication, [3] fault, and [4] damages. To make out a prima facie case for purposes of avoiding a summary judgment in favor of [defendants, plaintiff] would have to allege as to each element facts which would raise a genuine issue of fact for the jury.

(Citations omitted.) Here, the plaintiff alleged that during the December 14, 1981 city council meeting, the mayor openly accused him of "monkeying around in politics", of supporting a rival political faction in Oakville and of being unable to hold a job for a long period of time. For summary judgment purposes, the record adequately supports plain-

---

[9]*See* RCW 42.30.060.

tiff's claim that these statements were made and that the latter allegation was false. The plaintiff has presented no evidence, however, to support the additional elements of fault or damages that are essential to a defamation claim. Therefore, his defamation claim fails and we need not go further and decide whether or not the mayor's remarks were privileged.

ISSUE FOUR.

CONCLUSION. Plaintiff's termination from employment did not infringe upon any constitutionally recognized liberty or property interest and, therefore, did not violate his due process rights.

In *Ritter v. Board of Comm'rs*, 96 Wn.2d 503, 508, 637 P.2d 940 (1981), we held that:

"[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill–advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976). The protections of the Clause adhere only if the asserted individual interests are encompassed within the Amendment's protection of "life, liberty or property." *Paul v. Davis*, 424 U.S. 693, 712, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976). If protected interests are implicated, we then must decide if the procedures employed constituted "due process of law." *Morrissey v. Brewer*, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972).[10]

■■ The plaintiff claims that his termination from employment infringed upon a protected property interest. Property interests are created and their dimensions are defined by rules which stem not from the federal constitution, but from state law.[11] As we have held on numerous occasions, there is no constitutional "property" interest in

---

[10]The same analysis applies under the due process clause of the Washington Constitution. *See Giles v. Department of Social & Health Servs.*, 90 Wn.2d 457, 460–62, 583 P.2d 1213 (1978).

[11]*Giles*, at 460, citing *Bishop v. Wood*, 426 U.S. 341, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976).

public employment.[12]

We next turn to the plaintiff's claim that the termination of his employment infringed upon a protected liberty interest. Discharge from employment may implicate a liberty interest if the government either (1) imposes a stigma and thereby forecloses the employee's freedom to obtain other employment or (2) dismisses an employee on grounds that call into question his or her integrity, honor, or good name in the community.[13] In this case, neither of these requirements has been met.

As above discussed, the plaintiff alleges that in connection with his termination the mayor made derogatory remarks about him to the city council. The plaintiff presented no evidence, however, to show that he was thereby deprived of other employment opportunities or that his reputation was in any way damaged by the remarks. As we observed in *Giles v. Department of Social & Health Servs.*, 90 Wn.2d 457, 461, 583 P.2d 1213 (1978), in holding that a discharge for "inefficiency" did not implicate a liberty interest,

> Nearly any reason assigned for dismissal is likely to have some negative reflection on an individual. However, not every dismissal assumes a constitutional magnitude.

We hold that neither a liberty nor a property interest was infringed upon by the termination of plaintiff's employment and that his deprivation of due process claim fails.

ISSUE FIVE.

CONCLUSION. The plaintiff failed to show that the city council's decision to reduce the size of the police force was based on anything other than budgetary concerns; and even if, arguably, the mayor was personally motivated by impermissible political considerations in deciding to terminate

---

[12]*Giles*, at 460–61; *Olson v. UW*, 89 Wn.2d 558, 564, 573 P.2d 1308 (1978); *Reynolds v. Kirkland Police Comm'n*, 62 Wn.2d 720, 724, 384 P.2d 819 (1963); *Yantsin v. Aberdeen*, 54 Wn.2d 787, 788, 345 P.2d 178 (1959).

[13]*Ritter*, at 510, citing *Giles*, at 461.

the plaintiff's employment, defendants have established that plaintiff would have been terminated by the council regardless of any such political considerations. Therefore, plaintiff's First Amendment rights to free speech and association were not violated.

Government may not deny public employment because a person has exercised his or her First Amendment rights of speech or association.[14] In *Branti v. Finkel,* 445 U.S. 507, 518, 63 L. Ed. 2d 574, 100 S. Ct. 1287 (1980), the United States Supreme Court applied this principle to prohibit the discharge of a public employee on the basis of political party affiliation, where the government could not demonstrate that such affiliation was "an appropriate requirement for the effective performance of the public office involved."[15] Plaintiff similarly argues that he was impermissibly discharged because of his claimed association with the mayor's political opponents.

■ Where a public employee challenges his or her dismissal on First Amendment grounds, the employee must show that constitutionally protected conduct was a substantial factor in the decision to terminate his or her employment. If that is shown, the burden shifts to the government to prove by a preponderance of the evidence that the decision would have been the same even in the absence of the protected conduct. If that burden is satisfied, the dismissal will be upheld.[16] As the United States Supreme Court explains:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or other-

[14]*Connick v. Myers,* 461 U.S. 138, 142, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977); *Perry v. Sindermann,* 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 609–10, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967).

[15]*See also Elrod v. Burns,* 427 U.S. 347, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976).

[16]*Mt. Healthy Bd. of Educ.,* at 287.

wise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. . . . The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct.[17]

With this in mind, we examine the plaintiff's First Amendment claims against the city council members and the mayor.

Here, the plaintiff failed to produce evidence sufficient to create a genuine issue of fact to support his contention that the city council voted to reduce the Oakville police force to one full–time officer for constitutionally impermissible reasons. Two of the council members voted to retain two full–time police officers; the other three all testified at their depositions that their vote was based solely on budgetary considerations. The record establishes that the potential financial impact of both the impending loss of WPPSS funding, and the Oakville voters' rejection of a proposed tax levy, was thoroughly discussed by both the budget committee and the full city council. There is no evidence that any city council member ever considered reducing the police force for political reasons, or that the council had any motivation for doing so.

The plaintiff's claim against the mayor also fails, but for a different reason. For purposes of this summary judgment motion, we assume that the plaintiff's alleged association with political opponents of the mayor was constitutionally protected conduct, and that such conduct was a substantial factor in the mayor's decision to terminate plaintiff's employment. Even so assuming, however, it is clear that the plaintiff's employment would have been terminated in any event. For while the mayor had the authority to hire and fire individual officers, it was the city council that had the sole authority to determine the total number of officers on the Oakville police force. The council's decision to reduce

---

[17]*Mt. Healthy Bd. of Educ.*, at 285–86.

the police force to one full–time officer, for budgetary reasons, effectively eliminated plaintiff's temporary position on the force. Since plaintiff's termination was inevitable, regardless of the mayor's wishes, plaintiff's First Amendment claim fails.

Plaintiff's remaining claims can be disposed of more succinctly.

The plaintiff also contends that the defendants violated 42 U.S.C. § 1983 in terminating his employment. To prevail on this claim, he must show that a person or persons, acting under color of state law, deprived him of a right secured by the United States Constitution or by federal laws.[18] Since the plaintiff has not shown that the defendants deprived him of either his due process or First Amendment rights and, since he does not allege that he has been deprived of any other federally guaranteed right, his § 1983 claim fails.

Plaintiff's contention that the defendants acted arbitrarily and capriciously in terminating his employment is essentially repetitive of his prior claims, and is disposed of by our resolution of those claims in favor of the defendants.

Finally, plaintiff argues that summary judgment should not have been granted for all of the defendants because not all of the defendants moved for summary judgment. This argument, however, is based on an overly technical reading of the defense motions challenging the pleadings. A motion to dismiss pursuant to CR 12(b)(6) was filed on behalf of "the defendants" and was directed at all of the claims made in the plaintiff's complaint. The parties in argument before the trial court then proceeded to refer to matters in the record other than the pleadings, such as depositions and affidavits. Since none of this was objected to or excluded by the court, the trial court properly considered the motion as a summary judgment motion.[19] Furthermore, no one was

---

[18]*Parratt v. Taylor,* 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981).

[19]CR 12(b).

misled; the report of the arguments before the trial court demonstrates that all counsel treated the matter as a summary judgment motion on behalf of all the defendants.

The trial court did not err when, after extensive arguments and thorough consideration, it ruled that the plaintiff was not entitled to civil service protection, and that the defendants had not acted unlawfully in terminating the plaintiff's employment.

Affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.