ROBERTSON, Presiding Judge.
During the early morning hours of February 23,1996, an unidentified person fired two shotgun blasts into the Livingston home of Circuit Judge Eddie Hardaway. The Livingston Police Department, the Alabama Bureau of Investigation (“ABI”), and the Alabama attorney general’s office began an investigation of the incident.
On February 29, 1996, the ABI identified Steven Smith, Jr., a state trooper, as a suspect and interviewed Smith at length. Smith was not arrested or detained. Thereafter, ABI agents interviewed Smith’s girlfriend and other friends regarding Smith’s whereabouts on February 23, 1996. Smith’s girlfriend told the ABI agents that Smith was at home with her on February 23, 1996. However, she told Smith that the ABI agents threatened to arrest her and to have her children taken away from her if she did not cooperate with them.
On March 18, 1996, Smith requested a meeting with Livingston’s chief of police, Jeff Manuel, and the ABI agents assigned to the case. Smith met with Manuel, the ABI agents, and Smith’s commander, Captain Oscar D. Kyles, on March 19,1996. During the meeting, Smith indicated his anger that the investigation had involved questioning his girlfriend. After the meeting, Kyles orally instructed Smith not to discuss the investigation with anyone.
On March 21, 1996, the Sumter County Reporter-Journal newspaper published an article naming Smith as a suspect and stating, among other things, that Smith had been identified by an eyewitness to the shooting incident. It is undisputed that this article contained unsubstantiated statements about Smith and the investigation. Smith contacted the Tuscaloosa News newspaper about the article and granted a reporter an interview. Before the interview was published, the reporter contacted Kyles to confirm parts of the interview. Kyles promptly contacted Corporal Hubert Finch, Smith’s immediate supervisor, with directions that Finch instruct Smith not to make any statements or have any discussions with the press regarding the investigation and to refer any press inquiries to the State Troopers’ public information office in Montgomery. Kyles also directly communicated this order to Smith.
From March 18, 1996, through May 9, 1996, Smith continued to complain to his superiors about his dissatisfaction with the ABI’s handling of the investigation. Smith requested that his supervisors report his complaints to the highest levels of the Department of Public Safety (“the Department”). Thereafter, Smith wrote a letter to the editor of the Sumter County Reporter-Journal, which was published under the headline “Trooper Smith criticizes Police Chief, ABI” on May 9, 1996. Although the letter thanked the community for its help, the bulk of the letter criticized Manuel and *695 the ABI agents’ handling of the investigation and accused those individuals of lacking “character, courage, and backbone.” On May 16, 1996, the Sumter County Reporter-Joumal reported that the ABI had confiscated Smith’s May 9,1996, letter to the editor to further its investigation of Smith.
Thereafter, Smith wrote a second letter to the Reporter-Journal editor, which was published on May 23, 1996, under the headline “Trooper Smith responds to A.B.I. taking letter.” In that letter, Smith again criticized the ABI agents’ handling of the investigation and criticized the confiscation of his first letter to the editor. In both letters, Smith referred to the ABI as “ass backward investigators.” Smith wrote both letters to the editor while he was on medical leave from his employment, and he testified that the purpose of the letters was to make the community aware of the improper handling of the investigation.
Kyles filed a complaint/violation form with Major L.S. Ray, chief of the Highway Patrol Division of the Department, recommending that Smith be terminated from his trooper position with the Department. On June 25, 1996, Smith was informed that his employment was being terminated on June 30,1996. Smith requested an administrative board review hearing, which was conducted on July 9, 1996.
On July 9, 1996, Lieutenant Colonel L.N. Hagan, acting director of the Department, notified Smith by letter that he was terminating Smith’s employment. Hagan stated that Smith’s letters to the editor of the Sumter County Reporter-Journal constituted an “intentional disobedience and willful disregard of lawful orders” and an “unwarranted and unjustified public criticism of a unit of the [Department] and a public official.” Smith appealed his termination to the State Personnel Board.
On September 10, 1996, administrative law judge Richard Meadows held oral proceedings on Smith’s appeal. At the hearing, Smith asserted that his letters to the editor were protected by the First Amendment to the United States Constitution and that his termination was a violation of his First Amendment rights. On September 24, 1996, the administrative law judge filed his report with the Personnel Board, finding that the Department had proved by substantial evidence its charges against Smith and sustaining Smith’s termination. Smith filed a timely notice of appeal with the Personnel Board.
On October 31, 1996, Smith filed a petition for judicial review in the Sumter County Circuit Court. On motion of the Department, Judge Hardaway recused himself from hearing the petition, and the Chief Justice of the Supreme Court of Alabama appointed a special judge to hear Smith’s petition. Following oral argument of counsel, the trial court entered a judgment in favor of the Personnel Board and the Department, finding that the Personnel Board’s decision was not arbitrary and was not clearly erroneous.
Smith appeals, contending that the trial court applied the wrong standard of review and that the Department terminated him in violation of his First Amendment rights.
Pursuant to Ala.Code 1975, § 41 — 22—20(k), a reviewing court must generally afford the Personnel Board’s decision a presumption of correctness, and it may not substitute its judgment for that of the Personnel Board as to the weight of the evidence on questions of fact. Under this statute, the decision of the Personnel Board must be upheld unless
“substantial rights of the petitioner have been prejudiced because the [Personnel Board’s] action is:
“1. In violation of constitutional or statutory provisions;
“2. In excess of the statutory authority of the agency;
“3. In violation of any pertinent agency rule;
“4. Made upon unlawful procedure;
“5. Affected by other error of law;
“6. Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“7. Unreasonable, arbitrary or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.”
*696 Ala.Code 1975, § 41-22-20(k); State Highway Dep’t v. State Personnel Bd., 628 So.2d 878 (Ala.Civ.App.1993).
[1,2] However, the principal issue Smith has raised is whether the Department and the Personnel Board violated his First Amendment right to freedom of speech. As to this issue, the Personnel Board’s decision is not accorded a presumption of. correctness. Our Supreme Court has held that “[wjhether speech is protected is an issue of law, reviewable de novo on appeal.” Roberts v. Joiner, 590 So.2d 195 (Ala.1991), cert. denied, 504 U.S. 956, 112 S.Ct. 2302, 119 L.Ed.2d 225 (1992). To the extent that our review of this legal issue is predicated on factual matters, we presume the Personnel Board’s findings of fact are correct. § 41-22-20, supra.
A public employer potentially violates the First Amendment by disciplining or terminating an employee for speaking, if the statements at issue may be fairly characterized as addressing a public concern. Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Roberts, supra. If the speech is on a matter of public concern, a reviewing court must balance the employee’s interest in expressing himself on the matter with the state’s interest in promoting the efficiency of the public service it performs through its employees. Waters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); Rankin; and Roberts, supra. It is the court’s duty to apply the balancing test to the facts. Waters, supra.
In Waters, the United States Supreme Court considered the claim of a nurse employed at a state hospital that she had been terminated in violation of her right to free speech for speaking about her employer’s work practices and conditions. The Court first noted the rule set out in Pickering, supra, concerning when a state employee’s speech is protected:
“To be protected, the speech must be on a matter of public concern, and the employee’s interest in expressing herself on this matter must not be outweighed- by any injury the speech could cause to ‘the interest of the State, as an employer, in promoting the efficiency of the public services it performs through, its employees.’ ”
511 U.S. at 668 [114 S.Ct. at 1884] (quoting Pickering, supra, 391 U.S. 563, 568 [88 S.Ct. 1731, 1734, 20 L.Ed.2d 811]). The Court then pointed out that the constitutional review of restraints on the speech of state employees turned on different principles than review of restraints on speech imposed by the state on an individual — -that the state as employer has far broader powers to regulate speech than the state has as sovereign. 511 U.S. at 672-75, 114 S.Ct. at 1886-88. The Court reversed a summary judgment for the hospital on the conclusion that the balance between the employee’s interest in expression and the state’s interest depended upon the facts of each case.
In this case, the administrative law judge for the Personnel Board found that Smith’s letters addressed a matter of public concern. Accordingly, we must consider whether Smith’s interest in expressing himself is outweighed by the State’s interest in promoting the operation and efficiency of its law enforcement activities, in the context of the facts of this ease. The administrative law judge found:
“[T]he vast majority of the letter is to specifically and directly criticize employees of the Department of Public Safety and a local law enforcement officer. The speech also criticizes these two entities for the effect of the investigation upon the apparent victim. The speech calls for shame to be heaped upon a local law enforcement officer and refers to persons as ‘stupid S.O.B.’s.’ A fair reading of this sentence can only refer to investigators involved in the investigation. The speech specifically charges the local law enforcement officer to lack character, courage and backbone. The speech also refers to agents of the Alabama Bureau of Investigation as ‘ass backward investigators.’ The second letter again refers to agents of the Alabama Bureau of Investigation as ‘ass backward investigators’ and specifically criticizes investigatory techniques and actions of agents of the Alabama Bureau of Investigation. If the import of the two letters *697 was limited to an effort to thank the community for its support and to assert non-involvement or innocence a more difficult factual situation might be presented. However, the content of these two letters strongly supports the testimony of the Troop Commander and the Assistant Post Commander in their assertions the language contáined in the two letters tends to promote ‘friction’ both within the Department of Public Safety and to damage cooperation with brother law enforcement agencies. A fair reading of the letters leads to the conclusion the letters were to attack and criticize not thank supporters and assert non-involvement. To contend otherwise is simply to defy common sense and the plain language of the two letters.”
Our review of the record shows that the administrative law judge’s characterization of Smith’s letters is fully supported by the facts. We conclude that even though Smith’s speech addressed a matter of public concern, it was speech designed to criticize and discredit an on-going law enforcement investigation. In applying the case-by-case balancing test required by Waters, supra, we first consider other cases that have addressed similar situations involving law enforcement officers.
In the case of Angle v. Dow, 822 F.Supp. 1530 (S.D.Ala.1993), various police officers claimed that their rights to free speech were violated by discipline imposed on them for writing a memorandum ridiculing internal police department investigative practices. Although the court found that the officers’ speech involved a private joke within the department rather than a “public concern,” the court did apply the United States Supreme Court’s balancing test because of the officers’ contention that the speech was “political” and therefore entitled to additional protection.
The court in Angle addressed its application of this balancing test to speech by a police officer as follows:
“The touchstone of analysis for police officer speech is that employees of a law enforcement agency are subject to greater First Amendment restraints than most other ' citizens. [The police department and supervising officers’] ease is strengthened by the fact that the police department is a quasi-military organization. Courts should consider and give weight to the need for maintaining a close working relationship in quasi-military organizations like police departments. The Eleventh Circuit has expressly declared that it ‘recognize[s] and give[s] appropriate weight to previous authority setting forth the need of pólice departments to secure discipline and efficiency as a quasi-military entity.’ ‘[Qjuasi-military organizations have special disciplinary concerns. Quasi-military organizations ... generally by necessity must cast regulations in broad terms. Additionally, institutions such as the military and the police have needs “which must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society.” ’ Although police officers need not suffer a ‘watered-down version’ of their constitutional rights, ‘the state’s interest in regulating its police force can be especially compelling.’ Comments concerning superior officers’ integrity can directly interfere with the confidentiality, esprit de corps and efficient operation of a police department. Police departments have a substantial interest in developing discipline, esprit de corps, and uniformity to insure adequate promotion of safety of persons and property. When a police department can show that the speech in question actually disrupts the officer’s efficiency or the internal operation of the department or that the speech has the reasonable tendency to lead to such disruption, a court should not substitute its judgment for that of the department. ‘The need for high morale and internal discipline in a police force [has] led [the Eleventh Circuit] to hold that “a reasonable likelihood of harm [ (as opposed to actual harm) ] generally is ... enough to support full consideration of the police department’s asserted interests in restricting its employees’ speech.” ’ ”
822 F.Supp. at 1540 (emphasis in original) (footnotes and citations omitted). See also Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); and McMullen v. Carson, 754 F.2d 936 (11th Cir.1985). The *698 Angle court granted the employer’s motion for summary judgment with respect to the plaintiff officers’ claim that they were discharged in violation of their First Amendment rights to free speech.
In addition to Angle, other cases have addressed the balance between the state’s interest in effective law enforcement and a police officer’s right to free speech. See Acevedo v. City of Muskogee, 897 P.2d 256 (Okla.1995); Jordan v. City of Oakville, 106 Wash.2d 122, 720 P.2d 824 (1986). Like Angle, these cases addressed law-enforcement-officer speech that was arguably much less disruptive and critical than the speech in this case, and both cases concluded that the officer’s right to utter the speech in question did not outweigh the state’s interest in effective law enforcement.
Accordingly, we accept the administrative law judge’s factual findings that Smith’s speech in this case was disruptive to an ongoing investigation and was disruptive to effective law enforcement generally. Moreover, the facts of this ease indicate that Smith was warned at least twice that his speech was disruptive and was subject to discipline. Finally, we note that Smith’s speech was not a personal statement of innocence, but rather an attack on the law enforcement agencies’ investigation of his involvement in the crime. Applying de novo the Waters balancing test to the question whether Smith’s right to free speech as a law enforcement officer outweighed the state’s interest in “promoting the efficiency of the public services it performs through its employees,” we conclude that Smith’s rights do not outweigh the state’s interest. Accordingly, the judgment of the circuit court affirming Smith’s termination is due to be, and it is hereby, affirmed.
AFFIRMED.
YATES, MONROE, and THOMPSON, JJ., concur.
CRAWLEY, J., concurs specially.