This is an appeal from a summary judgment in favor of Schreiber Corporation, which was made final pursuant to Rule 54(b), A.R.Civ.P. Puckett, Taul Underwood, Inc. ("PTU"), is an engineering/construction firm specializing in the design and construction of water and wastewater treatment facilities. Schreiber Corporation, Inc. ("Schreiber"), sold two components of a wastewater treatment system known as a counter current aeration system ("CCAS") to PTU for use in a sewage treatment plant on Ft. Morgan peninsula in Baldwin County, Alabama. The sewage treatment plant failed to treat the sewage adequately.
Schreiber is one of a number of defendants named by PTU in a complaint filed on November 6, 1986, in the Circuit Court of Jefferson County, Alabama, seeking a declaratory judgment and an award of monetary damages. Also named in this suit as defendants were Fort Morgan Authority Sewer Service ("FMASS"), South Alabama Sewer Service Corporation ("SASS"), and Phillip W. Bass and Nell Bass (owners of substantially all of the outstanding capital stock of FMASS and SASS). The complaint prayed in pertinent part for "[A] declaratory judgment against Schreiber to the effect that the failure of aeration equipment furnished by Schreiber to achieve the oxygen transfer specified in PTU's process design for the STP (sewage treatment plant) constitutes a breach of warranty for which Schreiber is and will be liable to PTU for and damages sustained by PTU as a proximate result thereof."
In June 1984, PTU learned that a Baldwin County developer, Phillip Bass, was planning to construct a 0.6 million gallon per day ("MGD") capacity sewage treatment plant on the Ft. Morgan peninsula. Bass requested that PTU submit a "turnkey" bid for both the design and the construction of the proposed sewage treatment plant. PTU contacted Wynn C. Echols, the president of Jim House and Associates (a manufacturer's representative for Schreiber), concerning a CCAS. A CCAS treats wastewater by moving air diffusers through the waste as opposed to the conventional process by which the wastewater passes through an aeration device. Several components constitute a CCAS, including aeration equipment, an aerated grit and removal system, a screen, clarification equipment, and a screw pump for return sludge.
On July 14, 1984, Schreiber submitted a proposal to PTU, via Echols, which was based upon information provided by PTU, and which specified a 0.6 MGD facility. The literature included six different models of equipment configurations for a CCAS and set out standard design criteria applicable to each option. Blank spaces were provided in which PTU could designate its *Page 981 
preferred design criteria. PTU's president, James Puckett, made several changes in the proposal. He deleted five of the seven component parts listed in the Schreiber proposal for a CCAS. The mechanically cleaned screen and the grit removal system were ordered from a supplier other than Schreiber, the grease removal system was eliminated by PTU, and PTU changed the screen pump and return sludge system to centrifugal pumps ordered from another manufacturer. Thus, PTU did not buy a CCAS from Schreiber. PTU purchased aeration tank equipment, final clarifier equipment, and air blowers from Schreiber.
The developer, Phillip Bass, who had first specified a 0.6 MGD system, requested that PTU explore the feasibility of modifying the sewage treatment plant to achieve a capacity of 1.2 MGD. PTU retained the design services of AWARE corporation, which specializes in environmental engineering, to ascertain the feasibility of this modification. The goal was to determine whether sewage flows of 1.2 MGD could be treated with an extended aeration process to meet the effluent levels required by the Alabama Department of Environmental Management ("ADEM").
On August 8, 1984, PTU received the AWARE generic process design, establishing design flows for the volume of wastewater and design concentrations for the strength of specific pollutants, which was forwarded to Schreiber via Echols. On August 9, 1984, Schreiber prepared a proposal for PTU that incorporated PTU's and AWARE's design specifications. On August 10, 1984, FMASS contracted with PTU to design, engineer, and construct a sewage treatment plant on the Fort Morgan peninsula, with the capacity for 1.2 MGD. On August 14, 1984, PTU and Schreiber executed the sales agreement, in which Schreiber agreed to sell to PTU the aeration and clarification components of a CCAS for $170,000. The sales agreement specified that shipment "is estimated 12 weeks after receipt in Seller's office of complete approved submittal data." On August 17, 1984, Schreiber supplied PTU with a revised proposal, which was approved by PTU.
The Schreiber equipment was delivered on February 1, 1985, and was subsequently installed by Schreiber personnel in March 1985. Construction on the plant was substantially completed by April 1, 1985. From April 1, 1985, until April 20, 1986, the plant had little or no sewage influent to treat. On April 20, 1986, the plant went into operation and operated successfully. In June 1986 the volume increased substantially when the waste of the entire city of Gulf Shores was diverted into the plant, and the plant failed.
PTU then contacted AWARE corporation, which sent a representative, Kevin Torrens, to investigate the problem. He determined that part of the problem was inadequate oxygen transfer, and he determined that the facility was "underdesigned." PTU filed suit, contending that Schreiber is at fault for this underdesign, while Schreiber points out that PTU and AWARE were the project designers, and argues that it simply provided components based on their specifications.
At issue here are PTU's allegations that the aeration equipment that Schreiber supplied to PTU failed to achieve the oxygen transfer specified in PTU's process design, that the alleged malfunctioning of Schreiber's equipment constituted a breach of design warranties, and that PTU suffered damages as a result thereof. Schreiber responded to the complaint by denying that any design warranties had been made, by averring that PTU had failed to give it notice of breach of warranty as is required by Code 1975, § 7-2-607(3), and by averring that the only agreement between the parties was the sales agreement signed August 14, 1984, which clearly and conspicuously excluded express or implied warranties other than a one-year warranty that Schreiber's equipment would be free from defects in material and workmanship.
In November 1987 defendants FMASS, SASS, and Phillip and Nell Bass, filed a counterclaim against PTU, claiming damages in the amount of $1.2 million for the failed sewage treatment plant. PTU denied the allegations of that counterclaim, *Page 982 
raised affirmative defenses, and filed a third-party complaint in January 1988 against Schreiber. PTU filed a "fifth amendment to the original complaint/first amendment to the third-party complaint" on May 13, 1988, alleging fraudulent misrepresentation and fraudulent concealment by Schreiber. Schreiber countered that amendment with a motion to strike, or, in the alternative, for summary judgment.
The parties then submitted briefs and affidavits in support of their positions, and counsel presented oral argument. On August 12, 1988, the trial court granted Schreiber's motion to strike and its amended motion for summary judgment, and entered a final judgment for Schreiber pursuant to Rule 54(b) A.R.Civ.P., on all of PTU's claims against Schreiber alleging negligence, breach of warranty, fraud, and misrepresentation. PTU appeals from this judgment.
We must determine whether the trial court erred in entering Schreiber's summary judgment. Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. Although several issues are raised in this appeal, the dispositive question is whether the trial court erred in interpreting the sales agreement signed by the parties on August 14, 1984, as entitling Schreiber to a judgment as a matter of law. We hold that the trial court was correct, and we affirm the judgment.
The sales agreement states (in pertinent part) as follows:
 "SCHREIBER Corporation, Inc. 100 Schreiber Drive, Trussville, Alabama 35173 (hereinafter referred to as 'Seller') hereby agrees to sell to the buyer designated below (hereinafter referred to as 'Buyer') subject to all of the terms and conditions on the face and reverse sides here, the following equipment: . . . [Pages 1-5]
 "THE SALE OF THE EQUIPMENT DESCRIBED ABOVE IS MADE SOLELY ON AND EXPRESSLY SUBJECT TO ALL THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDES HEREOF. [Page 4]
"TERMS AND CONDITIONS [Page 5]
". . . .
 "5. . . . Seller is not liable in any event hereunder for any consequential, incidental or liquidated damages or penalties.
 "6. All products manufactured by Seller are warranted to be free from defects in material and workmanship under normal use for one year from the date of shipment provided the Buyer promptly notifies Seller in writing of a defect in said products and said products are found by Seller not to be in conformity with the aforesaid warranty. Where required in writing by Seller, any such defective products must be returned by Buyer to Seller's plant, transportation charges prepaid. Notwithstanding the foregoing the aforesaid warranty shall be void and unenforceable against Seller if the startup of the products is not authorized by Seller or if repairs or alterations are made thereto without Seller's written authorization. The aforesaid warranty excludes Seller's responsibility of liability for:
 "(a) Damage due to accident, abuse, shipment, improper installation or operation, or abnormal conditions of temperature, moisture, abrasion or corrosion;
 "(b) Cost of dismantling, installation, transportation, or insurance; or
 "(c) Defects in products manufactured by others and sold without alteration.
 "ALL OTHER WARRANTIES ARE EXCLUDED, WHETHER EXPRESS OR IMPLIED BY OPERATION OF LAW OR OTHERWISE, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS. SELLER SHALL NOT BE LIABLE FOR INCIDENTAL CONSEQUENTIAL DAMAGES DIRECTLY OR INDIRECTLY ARISING OR RESULTING FROM THE BREACH OF ANY OF THE TERMS HEREOF OR FROM THE SALE, HANDLING OR USE OF THE PRODUCTS SOLD. SELLER'S LIABILITY HEREUNDER, EITHER FOR A BREACH OF *Page 983 
WARRANTY OR OF NEGLIGENCE, IS EXPRESSLY LIMITED AT THE OPTION OF THE SELLER:
 "(A) TO THE REPLACEMENT AT THE AGREED POINT OF DELIVERY OF ANY PRODUCTS FOUND TO BE DEFECTIVE, (B) TO THE REPAIR OF SUCH PRODUCTS, OR (C) TO THE REFUND OR CREDITING TO THE BUYER OF THE PRICE OF SUCH PRODUCTS."
It is settled law in Alabama that lawful contracts between competent parties, voluntarily and fairly made, are valid and enforceable. Berkel Co. Contractors, Inc. v. ProvidenceHospital, 454 So.2d 496, 505 (Ala. 1984). A written contract of sale merges all prior negotiations and all prior oral understandings into the written contract between the parties.Sterling Distributors, Inc. v. Intermodal TransportationSystems, Inc., 403 So.2d 202, 204 (Ala. 1981). We have said, in affirming a summary judgment in a contract suit:
 "A general rule of contract law states that when the parties reduce their agreements to writing, the writing — in the absence of mistake or fraud or ambiguity — is the expositor of the transaction and the intentions of the party."
Smith v. Citicorp Person-to-Person Financial Centers, Inc.,477 So.2d 308 (Ala. 1985) (citations omitted).
Commercial parties may contract freely to limit the remedies available to them. An agreement between parties in a commercial transaction "may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts. . . ." Code 1975 § 7-2-719(1)(a). Thus, the clear public policy in Alabama is to allow a seller to limit the remedies available to a buyer.
By the terms of the sales agreement, Schreiber contracted to sell aeration and clarification equipment to PTU. This equipment comprised only two components of a total system that PTU had contracted to design and build. The record reflects that Schreiber had proposed to sell to PTU an entire CCAS system. However, PTU contracted to buy only two components from Schreiber. PTU, not Schreiber, had the contractual responsibility to design, engineer, and construct the project and to make sure that the components PTU chose, when put together, would satisfy its contract with FMASS.
Schreiber bargained for a limitation of liability as part of the terms of the sales agreement because it was not providing the entire system, according to the affidavit of Loren H. Nielson (president of Schreiber). The sales agreement limits Schreiber's liability for breach of warranty or for negligence to three remedies (see the contract as quoted above). PTU argues that such a limitation is against public policy. The sales agreement does not attempt to immunize or absolve Schreiber from liability; it merely limits the remedies available in the event of breach of warranty or negligence.
Schreiber's duties were spelled out in the equipment sales agreement executed by both parties. That written agreement states that the consideration of $170,000 was given for the supply of equipment, not for design services. Because Schreiber owed no design duties to PTU by contract, it cannot, as a matter of law, be found to have breached any such duties.
The sales agreement contained a specific warranty for a period of one year from the date of shipment of the equipment and excluded all other warranties, whether express or implied by operation of law or otherwise. The record reflects that the equipment was shipped, at the latest, in March 1985; therefore, all warranties clearly had expired before the suit was filed. PTU admits in its first amended complaint that the first notice to Schreiber of a claimed breach of warranty was given in July 1986. This was too late. Schreiber was entitled to a judgment on all of PTU's warranty claims, and the contractual exculpatory *Page 984 
clause effectively barred PTU's negligence claim.
Finally, PTU argues that it was error to grant Schreiber's motion to strike PTU's fifth amendment to the complaint. As to a pleading that is subject to a responsive pleading, Rule 15(a), A.R.Civ.P., allows one amendment as a matter of course, but only if the amendment is filed before a responsive pleading is filed. Otherwise, it is within the discretion of the trial court to allow or not to allow an amendment to such a pleading. We said in Stead v. Blue Cross-Blue Shield of Alabama, 294 Ala. 3, 310 So.2d 469, 471 (1975):
 "We simply state here that if Rule 15 is to be of any benefit to the bench, bar and the public, the trial judges must be given discretion to allow or refuse amendments. However, we state that amendments are to be freely allowed and refusal of an amendment must be based on a valid ground. We state also that Rule 15 must be liberally construed by the trial judges. But, that liberality does not include a situation where the trial on the issues will be unduly delayed or the opposing party unduly prejudiced."
In this case, the amendment was filed within two weeks of the setting for hearing of the motion for summary judgment. The amendment would have caused undue delay in the hearing. We have frequently recognized that undue delay in filing an amendment, when it could have been filed earlier based on the information available or discoverable, is in itself ground for denying an amendment. Stallings v. Angelica Uniform Co., 388 So.2d 942,947 (Ala. 1980). The record reflects that this suit was filed by PTU on November 6, 1986. PTU filed its fifth amendment on May 13, 1988. PTU had sufficient opportunity to amend earlier, but failed to do so.
The second factor that the trial court must consider is whether the opposing party would be unduly prejudiced by allowing the amendment. Clearly, PTU's fifth amendment to the complaint would have caused a contract/warranty action to become a fraud action — this new fraud action would have involved different theories of law, different witnesses, and different evidence, and would have been based upon far more than a mere expansion of earlier filings. The motion to strike was properly granted. See, Stead v. Blue Cross Blue-Shield ofAlabama, supra; Ex Parte Tidmore, 418 So.2d 866, 868 (Ala. 1982); Thomas v. Kellett, 489 So.2d 554 (Ala. 1986); Miller v.Holder, 292 Ala. 554, 297 So.2d 802 (1974).
We affirm the summary judgment.
AFFIRMED.
HORNSBY, C.J., and JONES, HOUSTON and KENNEDY, JJ., concur.