[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 33 
In 1997, Norman Todd was dismissed from his employment as a police officer for the City of Millbrook. In 1998, Todd sued the City; Al Kelley in his official capacity as the mayor; Capt. Kenneth Bradley in his official capacity as the chief of police; and Sgt. Ron Fields in his official capacity as Todd's supervisor. Todd alleged that the defendants had deprived him of property without due process of law, in violation *Page 34 
of the Fourteenth Amendment to the United States Constitution, and had violated his right to freedom of speech guaranteed by the First Amendment to the United States Constitution. He claimed that the defendants were, therefore, liable for damages pursuant to42 U.S.C. § 1983. Todd also alleged a state-law claim of wrongful discharge, asserting that the defendants had maliciously, willfully, and wantonly caused him to be terminated from his employment in retaliation for his reporting misconduct by Sgt. Fields and Mayor Kelley.
The trial court entered a summary judgment in favor of all defendants on all claims, and Todd appealed to the Alabama Supreme Court. The supreme court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
Norman Todd worked for the City of Millbrook as a police officer from the spring of 1996 until he was discharged on December 5, 1997. Sometime between February and April 1997, he reported to his supervisor and to Chief of Police Kenneth Bradley several instances of misconduct by Millbrook Mayor Al Kelley. Todd reported that he had seen the mayor driving under the influence of alcohol. Todd also recounted that the mayor had radioed Todd in his patrol car and had requested that he be picked up from a certain location and taken to his residence because he (the mayor) had been drinking alcoholic beverages and did not want to drive home. On one occasion, Todd said, he took the mayor home and the mayor refused to get out of the patrol car, saying that he "couldn't go in yet" or that he "needed to ride around [with Todd] for a while." Todd said that on that occasion he continued his patrol duties, with the mayor in the patrol car.
It is undisputed that Mayor Kelley knew of Todd's report. Chief Bradley testified by deposition that he talked to the mayor about Todd's report and "advised [the mayor] that he could not be riding with us when he was drinking." When Bradley was asked whether the mayor admitted "that he had been drinking when he had been riding with [police officers]," he said the mayor replied, "A little bit."
Todd also reported to Chief Bradley two instances of misconduct by Sgt. Ron Fields: sleeping on the job and sexually harassing a victim. Chief Bradley testified that he spoke with Sgt. Fields about Todd's report that Fields had been sleeping on the job and Fields denied that he had been sleeping. As to the report of sexual harassment, Todd stated that on the morning of July 26, 1997, he, Sgt. Fields, and Officer Robbie Johnson responded to a domestic-disturbance call at a residence in Deatsville. When the officers arrived on the scene, an older man reported that his granddaughter, P.E., and her boyfriend had been fighting and that the boyfriend had run off into the woods. Todd stated that they apprehended the boyfriend, that Sgt. Fields and Officer Johnson stayed outside with the boyfriend, and that he (Todd) went inside to talk to the granddaughter, P.E. Todd said that P.E. was sitting on the bed in a back bedroom with her hands over her face and would not talk to him. He radioed Sgt. Fields to come inside and try to talk to P.E. When Sgt. Fields entered the room, he directed Todd to go back outside with Officer Johnson and the boyfriend. Todd remained outside for a few minutes and then reentered the residence to check on Sgt. Fields. Todd said that, when he entered the back bedroom where he had left Sgt. Fields and P.E., he saw Sgt. Fields tucking in his shirt, zipping up his trousers and repositioning his gun belt. Todd reported what he had seen to Chief Bradley. *Page 35 
Bradley confirmed that Todd had reported the incident to him. He testified that, according to departmental policy, Todd was obligated to report any instance of what he thought was misconduct by a fellow officer. Bradley said that he talked to Sgt. Fields about Todd's report and that Fields denied any wrongdoing. Bradley also said that he talked with the mayor about the report, but he said he did not recall what the mayor said. Bradley testified that, although the mayor did not specifically ask him to take any further action to investigate the report, he (Bradley) asked a Lt. Evans to investigate the matter. Chief Bradley said that he also talked to Officer Robbie Johnson about Todd's report and that Officer Johnson stated that he was present and saw no misconduct by Sgt. Fields.
Bradley said two other police officers — P.K. Johnson and Herbie Cauthen — informed him that they had been present at the scene of the domestic-disturbance call and they also saw no improper conduct by Sgt. Fields. In deposition testimony, Officers P.K. Johnson and Herbie Cauthen said that they did not recall being present on the day in question and that they had never stated to anyone that they were present.
In deposition testimony, Officer Robbie Johnson, however, testified that Officer P.K. Johnson had responded to the domestic-disturbance call and that, although he could not be sure, he thought Officer Herbie Cauthen was there, too. Officer Robbie Johnson testified that he was in the room with P.E. the entire time that Todd and Fields were there and that he saw no inappropriate conduct by Sgt. Fields.
Sometime after Todd reported Sgt. Fields's alleged misconduct with P.E., Fields completed a performance evaluation of Todd. The evaluation gave Todd low marks and recommended that he not receive a pay raise. Todd filed a grievance, asked for a different evaluator, and was given another performance evaluation, this time by a Lt. Mayfield. Mayfield's evaluation, dated November 10, 1997, states:
 "Officer Todd is an aggressive capable police officer. His recall and persistence is above average. I believe if he would focus on his job performance and block out others he would excel; don't worry about what others do or say, just worry about doing a good job. I recommend the normal step raise [be] given Officer Todd on his anniversary."
Two days later, Chief Bradley approved the pay increase and informed Todd that he had been recommended for a raise. Less than one month later, on December 4, 1997, P.E. filed a complaint against the city. The next day, December 5, 1997, the mayor fired Todd.
In deposition testimony, P.E. stated that during the domestic-disturbance call of July 26, 1997, Officer Todd came into the room where she was hiding from her boyfriend and tried to talk to her, but she would not respond. Then, she said, Sgt. Fields entered the room and Todd left. P.E. testified that Fields patted her shoulder and repeatedly asked her whether she was all right. She nodded but would not lift her face. She said Fields said, "[W]ell hold up your face and let me see." P.E. said she faced Fields and held out her arm, showing him where her boyfriend had hit her. She said she began to cry and that Sgt. Fields said to her, "You don't have to put up with this; you don't have to put up with this." Then, according to P.E., Sgt. Fields said, "Dog, my darn girdle is too tight."
P.E. said Fields then stood up, unbuttoned his shirt and pants and said, "Yep, you don't have to do this because you're a nice person; you can have somebody like me." P.E. continued: "As he was saying *Page 36 
that, he was doing gestures with his hand picking up his crotch, and his pants were still unzipped and unbuttoned." P.E. testified that, at that moment, a screen door squeaked, she heard someone coming, and she saw Officer Todd. She said Sgt. Fields "was hurrying, trying to get [himself] back dressed completely." P.E. said that when Todd walked in he had a strange look on his face but said nothing.
P.E. testified that three police officers came to her grandfather's house that day: Todd, Fields, and an Officer Johnson, whose first name she did not know. She said Johnson was not in the room with her and Sgt. Fields. P.E testified that she saw Sgt. Fields on two other occasions after the incident. On both occasions, she said, Fields threatened her, first saying "[I]f I lose my wife and daughter because of what you're doing, I will get you." The second time, she said, Fields said, "I can do something to you and they won't ever find out what happened to you. I know if I can't hurt you, I can hurt somebody close to you. I'll hurt [your sister]."
 I. Amendment of the Complaint
Todd argues that the circuit court erred by denying his motion for leave to amend the complaint. Todd filed his complaint on July 6, 1998, suing the mayor, the chief of police, and Sgt. Fields in their official — but not in their individual — capacities. The case was first set for trial on April 12, 1999. On March 24, 1999, 18 days before the first trial setting, Todd moved to amend his complaint to add claims against the existing defendants in their individual capacities, to name three additional defendants, and to add a conspiracy claim pursuant to 42 U.S.C. § 1985. The circuit court denied the motion to amend, finding that Todd had not made "a showing of good cause for leave to amend."
Rule 15(a), Ala.R.Civ.P., provides, in pertinent part:
 "Unless a court has ordered otherwise, a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such amendment shall be freely allowed when justice so requires. Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause."
The Alabama Supreme court has explained that Rule 15(a) gives the trial court discretion to deny late amendments:
 "Although Rule 15(a) itself calls for liberal amendment, this court has consistently held that `the grant or denial of leave to amend is a matter that is within the discretion of the trial court and is subject to reversal on appeal only for an abuse of discretion. . . ."
Boros v. Baxley, 621 So.2d 240, 245 (Ala.), cert. denied,510 U.S. 997 (1993).
 "`[A]mendments are to be freely allowed and refusal of an amendment must be based on a valid ground.'
 "Rule 15, [Ala.R.Civ.P.], is not carte blanche authority to amend a complaint at any time. Discretion rests in the trial judge to deny amendments for good cause."
Stallings v. Angelica Uniform Co., 388 So.2d 942,946-47 (Ala. 1980) (quoting Stead v. Blue Cross-Blue Shieldof Ala., 294 Ala. 3, 6, 310 So.2d 469, 471 (1975)). "[U]ndue delay in filing an amendment, when it could have been filedearlier based on the information available or discoverable, is in itself ground for denying an amendment." Puckett,Taul Underwood, Inc. v. Schreiber Corp., 551 So.2d 979, *Page 37 
984 (Ala. 1989) (emphasis added). "[I]f the court determines . . . that a party has had sufficient opportunity to state a claim . . . but has failed to do so, leave to amend may be properly denied." Walker v. Traughber,351 So.2d 917, 922 (Ala.Civ.App. 1977) (quoted with approval inStallings v. Angelica Uniform Co., 388 So.2d at 947).
Todd's motion for leave to amend his complaint stated that, one month earlier, he had taken the depositions of several Millbrook police officers, as well as the personnel manager for the City of Millbrook, and that, based on those depositions, he concluded that the evidence "support[ed] a finding of willful, deliberate, intentional, wanton and reckless disregard of [Todd's] First, Fifth and Fourteenth Amendment rights" by the existing defendants. Thus, he sought to amend the complaint to sue the existing defendants in their individual capacities. However, based on the fact that Todd's initial complaint alleged that "the defendants acted . . . willfully, knowingly, purposely, and with the intent of depriving [Todd] of his [constitutional] rights," the trial court was authorized to conclude that Todd already had information suggesting that the existing defendants could be individually liable and, therefore, that Todd had unduly delayed filing this amendment.
The motion further stated that the depositions indicated that the existing defendants, as well as the three defendants Todd proposed to add by amendment, "acted in concert" with each other to deny Todd his constitutional rights. Thus, Todd sought to amend his complaint to add a conspiracy claim pursuant to § 1985. Because Todd's initial complaint, however, alleged that the defendants had "acted in concert" to deprive him of his rights, the trial court was authorized to conclude that the proposed amendment to add a conspiracy claim against the existing defendants was not based on newly discovered evidence and that Todd had "had sufficient opportunity to state a [conspiracy] claim but [had] failed to do so." Walker v. Traughber, 351 So.2d at 922. The trial court did not abuse its discretion by denying Todd's motion for leave to amend the complaint to sue the existing defendants in their individual capacities or to add a conspiracy claim against those defendants.
The same cannot be said, however, with respect to the trial court's denial of the amendment seeking to add three new defendants — Officers Robbie Johnson, P.K. Johnson, and Herbie Cauthen. Todd's motion alleged that he had recently taken the depositions of these three officers, as well as the deposition of P.E.; that the deposition testimony of the three officers, when compared with the deposition testimony of Chief Bradley and P.E., as well as the official radio-log sheets showing which officers had responded to the domestic-disturbance call involving P.E., "indicate[d] a causal link between [the three defendants sought to be added by amendment] in their official capacities, as well as their individual capacities, in violating [Todd's] First, Fifth, and Fourteenth Amendment rights."
The record shows the following dates for the taking of depositions:
Chief Bradley ........................... February 1, 1999
P.K. Johnson ............................ February 22, 1999
Herbie Cauthen .......................... February 22, 1999
P.E. .................................... February 23, 1999
Robbie Johnson .......................... February 23, 1999
The trial court had set a discovery deadline of March 1, 1999. The depositions referred to in Todd's motion to amend were taken before that deadline. Todd moved to add the new defendants on March 24, 1999, one month after taking depositions that, he said, alerted him to the potential liability of three additional *Page 38 
defendants, potential liability of which, he claimed, he was not previously aware.
Todd's motion for leave to amend made a prima facie showing, which the City[1] did not rebut, that he had moved to amend "as soon as the necessity for altering the pleading [became] apparent." Burkett v. American Gen. Fin.,Inc., 607 So.2d 138, 141-42 (Ala. 1992). Todd alleged that the need to alter his pleading did not become apparent until the four depositions taken on February 22 and February 23 had been transcribed and compared with earlier depositions and other evidence obtained during the discovery process.
In order to comply with the 42-day requirement of Rule 15(a), Todd would have had to amend his complaint to add the three new defendants by March 3, only 8 days after taking the last relevant deposition. Compare Tiller v. Nelson,679 So.2d 1095, 1099 n. 1 (Ala.Civ.App. 1996) (stating that the plaintiff "made a strong showing of good cause justifying leave of court to amend her complaint" by averring that her claim arose less than 42 days before the first trial setting). Although the trial court has discretion to refuse an amendment, the refusal "must be based on a valid ground." Stallings v. AngelicaUniform Co., 388 So.2d at 947. In light of Todd's showing that he did not have sufficient opportunity to state an earlier claim against Officers P.K. Johnson, Robbie Johnson, and Cauthen — a showing that was unrebutted by the City — we hold that the trial court abused its discretion by determining that Todd had not established "good cause for leave to amend" the complaint to add the three officers.
 II. The City's § 1983 Liability
Todd's action against Mayor Kelley, Chief Bradley, and Sgt. Fields in their official capacities is, in essence, an action against the City of Millbrook.
 "[A] suit against a governmental officer `in his official capacity' is the same as a suit "`against [the] entity of which [the] officer is an agent,'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. New York City Dep't of Social Servs., 436 U.S. 658 n. 55 (1978)), and . . . victory in such an `official-capacity' suit `imposes liability on the entity that [the officer] represents,' Brandon v. Holt, 469 U.S. 464, 471 (1985)."
McMillian v. Monroe County, Alabama, 520 U.S. 781,785 n. 2 (1997) (brackets added by the Court in McMillian).See also Monell v. Department of Soc. Servs.,436 U.S. 658, 691 n. 55 (1978); Roberts v. Joiner, 590 So.2d 195,203 (Ala. 1991) (Ingram, J., concurring in part and dissenting in part), cert. denied, 504 U.S. 956 (1992). However, we note:
 "[S]uing a defendant in [his official] capacity is usually necessary only when a suit against the governmental entity itself is barred [as, for example,] by the eleventh amendment to the United States Constitution [or by Art. I, § 14 of the Alabama Constitution of 1901, the state-sovereign-immunity clause]. In such instances, a suit against governmental officeholders in their official capacities is the only effective way to bring the governmental entity into court and obtain relief. Here, however, there are no eleventh-amendment [or state sovereign] *Page 39 
immunity issues presented. Therefore, while allowable, there is no need to maintain suit against Mayor [Kelley, Chief of Police Bradley,] and Officer [Fields] in their official capacities."
Shows v. Morgan, 40 F. Supp.2d 1345, 1361 (M.D.Ala. 1999). Because Todd did not sue Mayor Kelley, Chief Bradley, and Sgt. Fields in their individual capacities, and because Todd's "official-capacity" claim would impose liability only on the City those officials represent, we must determine whether the City can be held liable for the constitutional violations Todd alleges.
It is well settled that municipal corporations are "persons" subject to liability pursuant to § 1983. SeeMonell v. Department of Soc. Servs.,436 U.S. at 689-90. A municipality may not, however, be held vicariously liable under the doctrine of respondeat superior for an injury inflicted by one of its officers or employees. Id.
"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."
Monell, 436 U.S. at 694. The City maintains that the trial court properly entered a summary judgment in its favor because, it says, Todd presented no evidence indicating that a City "policy or custom" caused the alleged constitutional deprivations of which he complains.
In Monell, the Supreme Court indicated that a city establishes a policy or custom in two ways, namely: (1) by city lawmakers, or (2) "by those whose edicts or acts may fairly be said to represent official policy." 435 U.S. at 694. In a series of decisions following Monell, the Court further defined the contours of the second kind of municipal liability based on a policy or custom. See City of St.Louis v. Praprotnik, 485 U.S. 112 (1988); Pembauer v.City of Cincinnati, 475 U.S. 469 (1986); City ofNewport v. Fact Concerts, Inc., 453 U.S. 247 (1981);Owen v. City of Independence, 445 U.S. 622 (1980). The Court decided that municipal liability may be based on a single illegal act by a city official with final policymaking authority over the subject matter because, in such a case, the policymaker's act can fairly be considered to represent official city policy. Praprotnik, 485 U.S. at 123;Pembauer, 475 U.S. at 480. In effect, the Court held, the official with such final policymaking authority is
the City.
Whether an official possesses final policymaking authority is a question of state law, taking into account the applicable local ordinances or regulations. Jett v. Dallas Indep. SchoolDist., 491 U.S. 701, 737 (1989); Praprotnik,485 U.S. at 123; Pembauer, 475 U.S. at 483. In the present case, the City's liability turns on whether Mayor Kelley had final policymaking authority with respect to the dismissal of a city police officer.
In Praprotnik, the Supreme Court emphasized that, in determining whether a city official has final policymaking authority over a specific area of the city's business, the organic law of the city is critical. The Court stated that "it is self-evident that official policies can only be adopted by those legally charged with doing so," *Page 40 485 U.S. at 125 n. 2, explaining that it "would not be justified in assuming that municipal policymaking authority lies anywhere other than where the applicable law purports to put it." 485 U.S. at 126. In the present case, the record contains two documents relevant to the mayor's authority regarding the hiring and firing of employees.
The City of Millbrook has an employment handbook, entitled "Personnel Rules and Regulations — City of Millbrook," (hereinafter referred to as "Personnel Rules") a copy of which is given to all employees. In addition, the Millbrook Police Department has a separate policy manual entitled "Departmental Manual of the Millbrook Police Department" (hereinafter referred to as "Police Manual"), which contains rules, regulations and "special orders" pertaining to police-department employees.
Chapter I, Section 4.H., of the Personnel Rules designates the mayor as the "hiring authority" for the City. Special Order #3 of the Police Manual, entitled "Hiring New Personnel and Promotions," states:
 "City policy prescribes that the Mayor is the final hiring authority. The Chief of Police will make a written recommendation to the Mayor for the filling of all departmental positions contingent on satisfactory completion of a medical examination and drug screen. An interview of the applicant by the Mayor will be scheduled, if requested."
Thus, it is clear that the mayor has the final policymaking authority with respect to the hiring of all city employees.
Whether the mayor has the final policymaking authority with respect to the firing of city employees and, in particular, to the firing of city police officers, is not as clear. Police officers employed by the City are merit employees and can be dismissed only for cause. Section 5.01 of the Police Manual, relating to disciplinary action against police officers, states:
 "A member of the Department found guilty of violating a rule or regulation, or any of the provisions of general or special order, or upon conviction in a Court having a criminal jurisdiction, of any one of the following listed offenses, shall be subjected to reprimand, suspension, or termination or suffer such other disciplinary action as the Chief of Police may impose."
(Emphasis added.) Chapter IX, Section 10.B., of the Personnel Rules, relating to disciplinary actions, states:
 "B. In some cases it may be necessary for a person higher in the `supervisory chain' [than a supervisor or department head] to discipline an employee one or more steps below him or her. In such an event it may be necessary for action to be taken against the employee's supervisor as well."
(Emphasis added.) Section 5.01 of the Police Manual indicates that the chief of police, as head of the police department, is responsible for disciplinary actions (including termination) regarding city police officers. However, Chapter IX, Section 10.B., of the Personnel Rules appears to state an exception to the general rule that supervisors and department heads are responsible for disciplining the employees in their respective departments. Section 10.B. apparently imparts to someone higher in the "supervisory chain" of command than a supervisor or department head the authority to discipline the employees in that department. Thus, although § 5.01 of the Police Manual indicates that the chief of police has the final policymaking authority with respect to firing police officers, § 10.B. of the Personnel Rules suggests that a higher official, such as the mayor, has equivalent authority. *Page 41 
The mayor and the police chief apparently believed that the mayor's authority to hire and fire police officers was superior to that of the police chief and was final. In deposition testimony, Mayor Kelley stated that he "make[s] the final decision on hiring and . . . firing" of all city employees. Chief of Police Bradley testified by deposition:
 "Q. . . . [W]hy was Officer Todd not notified in writing as to the reason for his dismissal?
"A. I have no idea, sir.
"Q. You made the termination didn't you?
"A. No, sir, I did not.
"Q. Who made the termination?
"A. The mayor.
 "Q. Did the mayor advise you in advance that the termination was going to be made?
"A. No, sir.
 "Q. Aren't you the person responsible for supervision of the police officers?
"A. Yes, sir.
 "Q. Is it the mayor's responsibility to be discharging employees over whom you are the primary supervisor?
". . . .
"A. Yes.
". . . .
 "Q. What gives the mayor authority to discharge an employee of the police department?
". . . .
 "A. The mayor is over myself. The mayor makes the decisions to hire and fire. I can recommend."
Chief Bradley further testified:
 "Q. Was there anything that you could have done to have reversed the mayor's decision to terminate Officer Todd?
"A. No, sir, I don't think so.
 "Q. Is there anything that anybody else could have done to reverse the mayor's decision to terminate Officer Todd?
"A. I don't think so."
Praprotnik held that, to pinpoint where "final policymaking authority" lies, a municipality's organic law is critical, but not controlling. Praprotnik left open the possibility that a municipal official could delegate the authority given to him by the city's organic law to a subordinate (who is not empowered by the organic law) in such a way as to make the subordinate the final policymaker. SeePraprotnik, 485 U.S. at 130. It appears to us that, although he is not the mayor's subordinate, Chief Bradley delegated (or abdicated)to Mayor Kelley the authority given to him by § 5.01 of the Police Manual to terminate police officers in his department, and that the delegation of authority, "although not authorized by written law or express municipal policy, [was] `so . . . well settled as to constitute a "custom or usage" with the force of law.'" Praprotnik,485 U.S. at 127 (quoting Adickes v. S.H. Kress Co.,398 U.S. 144, 167-68 (1970)). We, therefore, hold that Mayor Kelley had final policymaking authority with respect to the firing of Officer Todd, and, therefore, in firing Todd, could subject the City of Millbrook to § 1983 liability.
Our conclusion as to the mayor's authority is bolstered by, although not dependent upon, the fact that Todd's termination was not subject to meaningful administrative review. Chapter VIII, Section 2.D., of the Personnel Rules states that "[a]ny employee who is demoted, reduced in compensation, suspended without pay, or dismissed, has the right to appear before [an] Arbitration Panel as *Page 42 
hereinafter outlined." The arbitration panel is composed of three city employees who are "to hear employee grievances and to make recommendations thereon." The panel, which must convene within five working days of the employee's request, is empowered to hear the employee's grievance (which may include his dismissal), gather pertinent documents, and interview witnesses. The employee has the right to appear before the panel with a representative. Within two days of meeting, the panel must submit a written statement of its findings and a "recommendation for action to the Mayor and [City] Council." The mayor and the city council then have five days to meet and consider the recommendation of the arbitration panel. The employee has the right to attend that meeting with a representative. Chapter VIII, Section E.3., of the Personnel Rules states:
 "The Mayor and Council may investigate the grievance in any manner they shall deem appropriate. They may accept the recommendation made to them, reject that recommendation entirely and substitute their own, or modify the recommendation as they see fit (subject to the policy that they may not increase the initially imposed punishment)."
Section E.4. requires the City Council to render its decision within five days, failing which the recommendation of the arbitration panel is to take effect. Section E.4. states that decisions of the Council are final.
The United States Court of Appeals for the Eleventh Circuit recently stated:
 "This Court's post-Praprotnik decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review."
Scala v. City of Winter Park, 116 F.3d 1396, 1401
(11th Cir. 1997) (holding that the power of a city's civil service board to reverse a termination decision by the city manager and public-safety director provided a discharged employee with the opportunity for "meaningful administrative review"). In our judgment, the fact that Todd's dismissal was subject to review by an arbitration panel does not negate the conclusion that the mayor had the "final policymaking authority" over the matter of Todd's termination. The ability to seek arbitration-panel review — when the panel's decision is "advisory only" and can be accepted, rejected or modified as the mayor and council "see fit" — does not, we conclude, constitute "meaningful administrative review." Compare Morro v. City ofBirmingham, 117 F.3d 508, 514 (11th Cir. 1997) (stating that a city personnel board's reversal of a police officer's suspension by the chief of police "demonstrates that the Personnel Board is not merely a rubber stamp for the Chief");Manor Healthcare Corp. v. Lomelo, 929 F.2d 633 (11th Cir. 1991) (holding that a mayor did not have final policymaking authority over zoning decisions when the city counsel couldoverride the mayor's veto of zoning ordinances);Vincent v. City of Talladega, 980 F. Supp. 410, 411
(N.D.Ala. 1997) (stating that a city personnel board'sreversal of a firefighter's suspension proved that the "personnel board was not a `rubber stamp' for the City").
 III. The City's Liability for the State-law Tort Claim
Section 11-47-190, Ala. Code 1975, provides for an action against a municipality for the "neglect, carelessness, or unskillfulness" of its agents, not for their intentional torts.See Couch v. City of Sheffield,708 So.2d 144, 154 (Ala. 1998). *Page 43 
Todd's state-law wrongful-discharge claim alleged that the defendants had "maliciously, willfully, and wantonly" caused him to be terminated from his employment. The acts as alleged in his complaint were purely intentional; there were no facts supporting a negligence theory of recovery. Accordingly, the trial court correctly entered the summary judgment on this claim.
 IV. The First Amendment Claim
Todd contends that he presented substantial evidence indicating that he was discharged in retaliation for reporting misconduct by Mayor Kelley and Sgt. Fields, and therefore that his discharge was in violation of his right to free speech. In Roberts v.Joiner, supra, the Alabama Supreme Court stated the following principles governing First Amendment claims such as Todd's:
 "`It is clear that a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.' Rankin v. McPherson, 483 U.S. 378, 383 (1987). The threshold question in determining whether an adverse employment decision violates the right to freedom of speech is whether the speech at issue may be fairly characterized as speech on a public concern. Id. at 384. If it is, the court must balance the interests of the employee as a citizen in commenting upon public concern with the interest of the state, as employer, in promoting the efficiency of the public services it performs through its employees. Id.
 "Whether speech is protected is an issue of law, reviewable de novo on appeal. Id. at 385-86. If it is determined as a matter of law that the speech is protected, the plaintiff must prove that the speech was a substantial or motivating factor in the challenged employment decision. Mount Healthy City School District Board of Educ. v. Doyle, 429 U.S. 274, 287 (1977). The burden then shifts to the defendant to show `by a preponderance of the evidence that it would have reached the same decision . . . in the absence of the protected activity.' Id. These last two issues are fact questions. Id."
590 So.2d at 201. See also Smith v. State Dep'tof Public Safety, 716 So.2d 693 (Ala.Civ.App. 1998).
The City does not argue that Todd's speech was not on a matter of public concern; we hold that, as a matter of law, it was. Compare Roberts v. Joiner, 590 So.2d at 201 (holding that police officers who reported town council members for using the town's discount to buy automobile tires for their personal use were speaking on a matter of public concern). The City also does not argue that Todd's interest in reporting official misconduct by the mayor and Sgt. Fields was outweighed by the City's interest in efficient public service; we hold that it was not. Id. at 202.
The City's arguments on Todd's free-speech claim are directed to the last two parts of the four-part test established inRankin and Doyle and restated by the Alabama Supreme Court in Roberts v. Joiner. The last two parts, as the court pointed out, raise fact questions. Todd clearly presented substantial evidence indicating that his reports of misconduct were a motivating factor in the decision to terminate him. The City presented evidence, consisting of citizen complaints and fellow-officer complaints against Officer Todd, indicating that it would have fired Todd in the absence of his reports of misconduct *Page 44 
by the mayor and Sgt. Fields. We have not detailed the substance of those complaints because they are relevant only to rebut Todd's claim that his First Amendment rights were violated, and the question whether those rights were violated is one of fact. Whether the City would have made the same decision in the absence of Todd's reports is a question a jury will have to decide.
 V. The Due-Process Claim
Todd argues that he was denied procedural due process because he was not given a pretermination hearing, or notice and an opportunity to be heard, before being discharged.
Because Todd was a merit employee and therefore could be dismissed only for cause, he had a property right in continued employment with the City. See Cleveland Bd. ofEduc. v. Loudermill, 470 U.S. 532, 538 (1985); Board ofRegents v. Roth, 408 U.S. 564, 576-78 (1972). Thus, the City could not deprive him of this right without constitutionally adequate proceedings, or due process. Loudermill,470 U.S. at 541. Due process for a tenured public employee requires a pretermination opportunity to respond to the employer's charges, coupled with adequate post-termination administrative procedures. Id. at 547-48. Although the pretermination hearing "need not be elaborate," id. at 545, due process mandates "`some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." Id. at 542 (quotingBoard of Regents v. Roth, 408 U.S. at 569-70).
It is undisputed that Todd was terminated without a prior hearing. Todd was not even provided with advance notice that he would be terminated. He was simply called into the mayor's office and given "two minutes to decide" whether to resign or be fired. When he inquired as to the reasons for his discharge, the mayor told him to "look in his personnel file."
Although the City has a grievance procedure (a mechanism we described in some detail in Part II of this opinion), that procedure is triggered only after the adverse employment decision — in this case, termination — occurs. Obviously, it does not qualify as a "pretermination opportunity to respond." The Personnel Rules outline a system of performance reviews by supervisors, coupled with personnel-record documentation of disciplinary actions against employees,[2] but they contain no requirement *Page 45 
that, before termination, an employee be given the opportunity to respond to the charges against him. We cannot escape the conclusion that Todd's discharge without a pretermination hearing violated his right to procedural due process. SeeEnterprise Fire Fighters' Ass'n v. Watson, 869 F. Supp. 1532
(M.D.Ala. 1994).
Citing Parratt v. Taylor, 451 U.S. 527 (1981), andRoberts v. Joiner, supra, the City argues that Todd was not denied due process because he was entitled to post-deprivation review of his termination. We disagree. When a plaintiff challenges the constitutional sufficiency of the termination-review system itself, as opposed to challenging the system as it was applied to him, then a violation of the plaintiff's procedural due-process rights is complete when he is terminated. SeeEnterprise Fire Fighters' Ass'n v. Watson,869 F. Supp. at 1540-41. See also McKinney v. Pate, 20 F.3d 1550, 1557
(11th Cir. 1994) (en banc), cert. denied sub nom. McKinney v.Osceola County Bd. of County Comm'rs, 513 U.S. 1110 (1995).
 "By its very nature, however, when the violation of due process is the failure [of the system] to provide a pretermination hearing, the violation cannot be cured subsequent to termination. The right is lost once termination has been effected. If the rule were otherwise, a public employee's right to a pretermination hearing as explicated in Loudermill
would be chimerical and ultimately meaningless because it could be `cured' in each instance simply by providing a hearing after termination. Moreover, the violation of due process is complete even if it later appears that the termination was substantively correct."
Watson, 869 F. Supp. at 1541.
Parratt v. Taylor and Roberts v. Joiner do not apply, for the reasons stated by the United States District Court for the Middle District of Alabama in Watson:
 "The defendants also rely upon a decision of the Alabama Supreme Court, Roberts v. Joiner, 590 So.2d 195 (Ala. 1991), cert. denied, 504 U.S. 956 (1992), which is easily distinguished. First, the Court was reviewing a termination that occurred in 1983, prior to the Loudermill decision in 1985. Although the Court relied on Parratt, it acknowledged that with the Loudermill decision, `the United States Supreme Court's position on whether postdeprivation remedies sufficiently provide due process seems to have changed.' Id. at 198. The Roberts
Court declined to apply Loudermill retroactively. Second, the plaintiffs in Roberts were challenging the actions of a city council, and not the personnel procedures of the town. Id. at 201."
Watson, 869 F. Supp. at 1541 n. 6. Moreover, sinceRoberts v. Joiner was decided, *Page 46 
our supreme court has indicated that Parratt is inapplicable to employment-termination cases. See Stallworth v. City ofEvergreen, 680 So.2d 229, 234-35 (Ala. 1996).
 VI. Summary
That part of the circuit court's order denying Todd's motion for leave to amend his complaint to sue the existing defendants in their individual capacities and to add a conspiracy claim against the existing defendants is affirmed. That part of the circuit court's order denying Todd's motion for leave to amend his complaint to add three new defendants is reversed. The summary judgment is affirmed as to the state-law wrongful-discharge claim, but reversed as to the remaining claims against the existing defendants, and the cause is remanded for further proceedings.
The appellant's motion to strike portions of the appellees' brief is denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Yates and Thompson, JJ., concur.
Robertson, P.J., and Monroe, J., concur in the result.
[1] Because we need not separately address any claims against the city officials in their official capacities, we will refer only to the City and not to the officials in their official capacities when addressing Todd's substantive claims.
[2] Chapter IX of the Personnel Rules, relating to disciplinary actions, contains these provisions:
"SECTION 9. DUTIES AND RESPONSIBILITIES
 ". . . It is the duty of all supervisory personnel to promptly discuss improper or inadequate performance with the employees so as to correct deficiencies and to avoid disciplinary action whenever possible.
 "IMPORTANT. EVERY case of disciplinary action will be fully documented by the supervisor or department head. Except for oral reprimands, a written report will be immediately forwarded to the Personnel Director to be placed in the employee's personnel file.
"SECTION 10. GROUNDS FOR ACTION
 "A. Whenever employee performance, attitude, work habits, or personal conduct at any time falls below a desirable level, supervisors shall inform employees promptly and specifically of such lapse and give counsel and assistance. If appropriate and justified, a reasonable period of time for improvement may be allowed before initiating disciplinary action. In some instances a specific incident may justify a severe disciplinary action in and of itself; however, the action to be taken depends on the seriousness of the incident and the whole pattern of the employee's past performance and conduct.
". . . .
 "C. Discipline shall be, when circumstances permit, of an increasingly progressive nature for each successive instance of employee misconduct. Each level of progressive discipline shall be documented in the employee's personnel record. In recognition of the fact that each instance of misconduct differs in some respect, the City has a right to treat each occurrence individually without setting a precedent for future cases. The following grounds for action are not to be a limitation on the retained management rights of the City, but are to be used as a guide. The recommended penalties may be modified by the appropriate City official to include a lesser or more severe penalty when extenuating circumstances are found. The action to be taken depends on the seriousness of the incident and the whole pattern of the employee's past performance and conduct."