590 So.2d 195 (1991)
Jim ROBERTS, et al.
v.
Jim JOINER and John Milner.
1900502.
Supreme Court of Alabama.
September 6, 1991.
Rehearing Denied November 8, 1991.
*196 C. Peter Bolvig of McDaniel, Hall, Conerly & Lusk, P.C., Birmingham, for appellants.
Michael J. Evans and Gary P. Cody of Longshore, Evans & Longshore, Birmingham, for appellees.
PER CURIAM.
Jim Joiner and John Milner, who were employed as law enforcement officers by the Town of Morris (the "Town"), filed a 42 U.S.C. § 1983 action against all the members of the town council of Morris, alleging, among other things, that the town council members had reduced their salaries and then had terminated them and in so doing had both deprived them of property without due process of law, in violation of the Fourteenth Amendment to the United States Constitution, and violated their right to freedom of speech guaranteed by the First Amendment to the United States Constitution. Later, another town council was elected, and the new town council members (Jim Roberts, et al.) were substituted as parties to the action, pursuant to Rule 25(d)(1), A.R.Civ.P. The jury returned a verdict in favor of the plaintiffs in the amount of $100,000 each. The trial court awarded Joiner an additional $25,430 for lost wages and lost insurance premium benefits; awarded Milner an additional $39,034 for lost wages; ordered Milner reinstated; and entered a judgment on the verdict.
In 1983, Joiner was the Town's chief of police and Milner was a sergeant in the police department. In late November or early December 1983, Joiner and Milner informed the Town's mayor, Lamar Reid, that town council members Earl Peyton and Frank Keith had purchased tires through the Town's account for their personal use. Peyton and Keith had paid for the tires, but had received them at a substantially discounted price by using the Town's account. Joiner and Milner also notified the State Ethics Commission, and *197 they say that the Ethics Commission told them that it would be best for the Town to handle the situation internally.
On December 18, 1983, the town council met to address "the tire situation." It determined that Peyton and Keith would resign from the committee that purchased goods for the Town and that they should pay the tire store the amount of the discount they had improperly taken.
On December 27, 1983, the town council voted to borrow $8,500 on a 90-day promissory note to cover payroll expenses.
In early January 1984, Keith, who was the town council member directly supervising the police department, altered Milner and Joiner's work schedules, and the plaintiffs allege that this was the beginning of the retaliation for their telling on Peyton and Keith. Joiner testified that also in early January, Keith told him to find a reason to fire Milner.
On January 10, 1984, Keith made a motion to lay off the police dispatcher, demote a police officer to dispatcher, and cut all regular full-time employees' salaries by five percent. The town council, citing financial difficulties, approved the motion. The full-time employees were Joiner, Milner, the police officer who was demoted to dispatcher, and the town clerk, who had originally brought the tire purchases to the attention of Milner.
Shortly after that meeting, Joiner told the mayor and a town councilman that the pay cut was in retaliation for his telling on Peyton and Keith about the tire purchases.
On January 28, 1984, the town council met and Joiner read a letter to the council stating that the pay cuts and layoffs were retaliation. Milner attended this meeting.
The town council met again on February 28, 1984. Councilman Chambers questioned the Town's paying insurance for all the members of Joiner's family. The town council had previously voted not to provide family health insurance for employees hired after January 26, 1982. Joiner had resigned as police chief in February 1982 and then had been rehired in March 1982; accordingly, Chambers argued, Joiner was not entitled to family health insurance. The town council voted to pay only Joiner's health insurance premiums.
Joiner and Milner again complained to the town council that this was retaliation.
Either the last day of February or the first day of March 1984, Joiner moved from Morris to Jasper, Alabama. Joiner testified at trial that his family moved and that his wife got a job because it was apparent to him that he was going to be terminated.
Joiner and Milner attended the town council's March 13, 1984, meeting, during which the council approved this resolution:
"WHEREAS, the Council of the Town of Morris recognizes publicly that there is a problem existing between the Police Dept. and the Council members.
"WHEREAS, the Council wants to try to resolve the problem as it is detrimental to the operation of the Town.
"WHEREAS, the Council is giving two weeks to work the problems out and if a solution cannot be settled on, then the Council will have to resolve the matter at the next Council meeting."
On March 15, 1984, Milner and Joiner met with the town council to try to resolve their difficulties, but both sides were intransigent, the plaintiffs demanding a full reinstatement of benefits and the town council unwilling to reinstate any benefits.
On March 23, 1984, Joiner and Milner filed this action, specifically claiming that their pay had been cut and that insurance for Joiner's family had been terminated in retaliation for their reporting the tire purchases to the mayor. The complaint requested damages under 42 U.S.C. § 1983 for alleged violations of the plaintiffs' rights to free speech and due process, and requested damages based on state law claims for breach of contract, "bad faith," outrage, and intentional infliction of emotional distress.
On March 29, 1984, the town council met again. The mayor stated alleged reasons for the town council's dissatisfaction with the plaintiffs' work and asked them to resign. They were at the meeting and refused to resign; the town council voted to *198 terminate them. Keith and Peyton did not vote.
The plaintiffs amended their complaint to claim additionally that they had been terminated without due process and in violation of their right to free speech.
At trial, the plaintiffs dropped the state law claims and proceeded only on their § 1983 action. In addition to their free speech claims, the trial court allowed the plaintiffs' claim concerning deprivation of property without due process to go to the jury on at least three theories: 1) that the pay cut was a deprivation without due process, 2) that the reduction of Joiner's family insurance benefits was a deprivation without due process, and 3) that the plaintiffs were terminated without due process. The jury returned a general verdict.
For the plaintiffs to recover for the alleged deprivation of their property rights without due process of law, they must prove both 1) that they had a property interest and 2) that they were deprived of that interest without due process of law. Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). For the sake of discussion only, we assume that they had a property interest and resolve the case by addressing whether they were deprived of such an interest without due process of law. Specifically, we address the plaintiffs' claims that they were terminated without due process.
In relation to that claim, the plaintiffs argue that they were entitled to receive notice of the charges against them and were entitled to a hearing prior to their termination. However, as we later explain in more detail, according to United States Supreme Court decisions in Parratt and Logan, which had been decided at the time of the transactions underlying this lawsuit, even in the absence of pretermination procedures, posttermination remedies can properly provide due process under the United States Constitution in relation to Joiner and Milner's claim that the town council itself deprived them of property without due processalthough if their claim had been based on a state-established ordinance or statute that purportedly denied them due process, such postdeprivation remedies might have been insufficient.
Since the transactions occurred, the United States Supreme Court's position on whether postdeprivation remedies sufficiently provide due process seems to have changed. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The plaintiffs do not present an argument that we should retroactively apply Loudermill, however, and we are not inclined to do so without such an argument. See Cox v. Cook, 420 U.S. 734, 95 S.Ct. 1237, 43 L.Ed.2d 587 (1975); Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).
In Parratt, an inmate in a Nebraska correctional facility ordered through the mail certain hobby materials. When they arrived, he was in solitary confinement, where he was not permitted to have the materials, and when he was released from solitary confinement, the materials had been lost. He brought a 42 U.S.C. § 1983 action, alleging deprivation of property without due process of law. The United States Supreme Court wrote:
"Our inquiry therefore must focus on whether the respondent has suffered a deprivation of property without due process of law. In particular, we must decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy the requirements of procedural due process.
"This Court has never directly addressed the question of what process is due a person when an employee of a State negligently takes his property. In some cases this Court has held that due process requires a predeprivation hearing before the State interferes with any liberty or property interest enjoyed by its citizens. In most of these cases, however, the deprivation of property was pursuant to some established state procedure and `process' could be offered before any actual deprivation took place. *199 For example, in Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the Court struck down on due process grounds a New York statute that allowed a trust company, when it sought a judicial settlement of its trust accounts, to give notice by publication to all beneficiaries even if the whereabouts of the beneficiaries were known. The Court held that personal notice in such situations was required and stated that `when notice is a person's due, process which is a mere gesture is not due process.' ... [Here the Court cited several cases dealing with predeprivation notice.] In all these cases, deprivations of property were authorized by an established state procedure and due process was held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur.
"We have, however, recognized that post-deprivation remedies made available by the State can satisfy the Due Process Clause. In such cases, the normal predeprivation notice and opportunity to be heard is pretermitted if the State provides a postdeprivation remedy. In North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), we upheld the right of a State to seize and destroy unwholesome food without a preseizure hearing. The possibility of erroneous destruction of property was outweighed by the fact that the public health emergency justified immediate action and the owner of the property could recover his damages in an action at law after the incident....
"....
"Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an `opportunity which must be granted at a meaningful time and in a meaningful manner.' Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). However, as many of the above cases recognize, we have rejected the proposition that `at a meaningful time and in a meaningful manner' always requires the State to provide a hearing prior to the initial deprivation of property....
"....
"[The Court quoted with approval the following statements from Bonner v. Coughlin, 517 F.2d 1311, 1319 (7th Cir. 1975), modified en banc, 545 F.2d 565 (1976)]:
"`It seems to us that there is an important difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers. In the former situation the facts satisfy the most literal reading of the Fourteenth Amendment's prohibition against `State' deprivations of property; in the latter situation, however, even though there is action `under color of' state law sufficient to bring the amendment into play, the state action is not necessarily complete. For in a case such as this the law of Illinois provides, in substance, that the plaintiff is entitled to be made whole for any loss of property occasioned by the unauthorized conduct of the prison guards. We may reasonably conclude, therefore, that the existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment.'"
451 U.S. at 537-42, 101 S.Ct. at 1914-16 (emphasis original).
Accordingly, Parratt seems to indicate that Joiner and Milner were not necessarily entitled to predeprivation proceedings, because they are challenging actions by town council members instead of established state procedures. Parratt also seems to indicate that postdeprivation proceedings in this situation can properly provide due process.
In Logan, the plaintiff challenged established state procedures. Logan was discharged from Zimmerman Brush Company *200 purportedly because he had a physical handicap that rendered him incapable of working. Logan challenged that discharge under the Illinois Fair Employment Practices Act. The United States Supreme Court described the events following Logan's challenge:
"[Logan's filing of a charge with the Illinois Fair Employment Practices Commission] triggered the Commission's statutory obligation under ¶ 858(b) to convene a factfinding conference within 120 days; in Logan's case, this meant by March 13, 1980. Apparently through inadvertence, the Commission's representative scheduled the conference for March 18, five days after expiration of the statutory period. Notice of the meeting, which was mailed to both parties in January 1980, specified the hearing's date and location and declared that attendance was `required.' It, however, did not allude to the FEPA's 120-day time limit. The Commission also asked the company to complete a short questionnaire concerning its employment practices, and directed that it submit its answers by March 10. The company did this without objection.
"When the conference date arrived, the company moved that Logan's charge be dismissed because the Commission had failed to hold the conference within the statutorily-mandated 120-day period. This request was rejected. The company thereupon petitioned the Supreme Court of Illinois for an original writ of prohibition. That court stayed proceedings on Logan's complaint pending decision on the request for a writ....
"Before the Illinois Supreme Court, Logan argued that terminating his claim because of the Commission's failure to convene a timely conferencea matter beyond Logan's, or indeed the company's, controlwould violate his federal rights to due process and equal protection of the laws. But the court noted that the statutory provision at issue, ¶ 858(b), declared: `Within 120 days of the proper filing of a charge, the Commission shall convene a fact finding conference....' (Emphasis added [in Logan].) The Illinois court found this legislative language to be mandatory, and accordingly it held that failure to comply deprived the Commission of jurisdiction to consider Logan's charge.
"The Illinois Supreme Court summarily rejected Logan's argument that his due process and equal protection rights would be violated were the Commission's error allowed to extinguish his cause of action."
455 U.S. at 426-27, 102 S.Ct. at 1152-53 (citations omitted).
Addressing Logan's alleged deprivation of due process, the Supreme Court wrote:
"To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement. "On the other hand, the Court has acknowledged that the timing and nature of the required hearing `will depend on appropriate accommodation of the competing interests involved.' Goss v. Lopez, 419 U.S. [565], at 579 [95 S.Ct. 729, at 738, 33 L.Ed.2d 548]. These include the importance of the private interest and the length or finality of the deprivation, see Memphis Light, Gas & Water Div. v. Craft, 436 U.S. [1], at 19 [98 S.Ct. 1554, at 1565, 56 L.Ed.2d 30]; Mathews v. Eldridge, 424 U.S. [319], at 334-335 [96 S.Ct. 893, at 902-903, 47 L.Ed.2d 18]; the likelihood of governmental error, see id., at 335 [96 S.Ct., at 903]; and the magnitude of the governmental interests involved, see ibid., and Wolff v. McDonnell, 418 U.S. [539], at 561-563 [94 S.Ct. 2963, at 2977, 41 L.Ed.2d 935].
"Each of these factors leads us to conclude that appellant Logan is entitled to have the Commission consider the merits of his charge, based upon the substantiality of the available evidence, before deciding whether to terminate his claim....
"....
"Despite appellee Zimmerman Brush Company's arguments, the recent decision in Parratt v. Taylor, 451 U.S. 527 *201 [101 S.Ct. 1908] (1981), is not to the contrary....
"....
"[The company's] argument misses Parratt's point. In Parratt, the Court emphasized that it was dealing with `a tortious loss of ... property as a result of a random and unauthorized act by a state employee ... not a result of some established state procedure.' 451 U.S., at 541 [101 S.Ct., at 1916]. Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conferencewhether the Commission's action is taken through negligence, maliciousness, or otherwise. Parratt was not designed to reach such a situation. See id., at 545 [101 S.Ct., at 1918] (second concurring opinion). Unlike the complainant in Parratt, Logan is challenging not the Commission's error, but the `established state procedure' that destroys his entitlement without according him proper procedural safeguards."
455 U.S. at 434-36, 102 S.Ct. at 1156-58.
In the case before us, Joiner and Milner are challenging the town council's actions, not an established state procedure, so Parratt is more apposite than Logan. The evidence indicates that the "Town of Morris Personnel Policy" provides for a post-termination appeal and hearing. An employee is entitled to written notice setting forth the reasons for his termination and is entitled to a hearing on his termination. The hearing may be before either the town council or an appointed hearing officer. An employee has the right to representation by an attorney and may call witnesses and present evidence at the hearing. Subsequent to the hearing, the employee has the further right to judicial review of the proceedings by the circuit court.
The evidence also indicates that instead of pursuing the post-termination procedures, the plaintiffs opted to amend their complaint (which had been filed before they were terminated) to use the termination as another theory for recovery on their state law and § 1983 claims.
Considering all the evidence, we hold that the Town did not deprive Joiner and Milner of property without due process of law in relation to their claims concerning their termination, Parratt, and that the trial court erred in submitting that claim to the jury. We intend that holding to be construed narrowly. We do not address whether the trial court erred in submitting to the jury the plaintiffs' claims of a deprivation of property without due process based on the pay cuts and Joiner's loss of his family's insurance.
As to the plaintiffs' free speech claims, the law on deprivations of freedom of speech is clearly established, unlike the law relating to due process that we have just discussed, although the application of the law to facts in the context of free speech claims has produced dramatically different results in seemingly similar factual situations. "It is clear that a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). The threshold question in determining whether an adverse employment decision violates the right to freedom of speech is whether the speech at issue may be fairly characterized as speech on a public concern. Id., at 384, 107 S.Ct. at 2897. If it is, the court must balance the interests of the employee as a citizen in commenting upon public concern with the interest of the state, as employer, in promoting the efficiency of the public services it performs through its employees. Id.
Whether speech is protected is an issue of law, reviewable de novo on appeal. Id., at 385-86, 107 S.Ct. at 2897-98. If it is determined as a matter of law that the speech is protected, the plaintiff must prove that the speech was a substantial or motivating factor in the challenged employment decision. Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The burden then shifts to the defendant to show "by a preponderance of the evidence that it would *202 have reached the same decision ... in the absence of the protected activity." Id. These last two issues are fact questions.
Id.
In addition to the evidence that we have already discussed, the Town's mayor testified in deposition and at trial that he thought the town council's actions against Joiner and Milner were retaliation for their telling about the tire purchases.
We must first determine whether Joiner and Milner's communications in turning in Peyton and Keith to the mayor and town council were a matter of public concern. Speech on matters of public concern has been defined as speech "fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689-90, 75 L.Ed.2d 708 (1983). That inquiry into what is a public concern requires a court to consider the content, form, and context of the speech at issue, as revealed by the entire record. Rankin, 483 U.S. at 385, 107 S.Ct. at 2897.
In determining whether speech is a matter of public concern, many courts have particularly focused on the extent to which the content of the employee's speech was calculated to disclose wrongdoing, inefficiency, or other malfeasance on the part of governmental officials in the conduct of their official duties. See Wulf v. City of Wichita, 883 F.2d 842, 857 (10th Cir.1989); Koch v. City of Hutchinson, 847 F.2d 1436, 1445, 46 n. 17 (10th Cir.1988), cert. denied, 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988), and the numerous cases cited in Wulf and Koch for this proposition.
Considering the above discussion, we hold that Joiner and Milner's speech in turning in the councilmen for the improper tire purchases was a matter of public concern. We further hold that on balance, Joiner and Milner's interest (as well as the public's), in the free speech involved in turning in Keith and Peyton outweighed any purported state interest in promoting the efficiency of public services. The law should not allow the Town to create problems with Joiner and Milner because of their reporting the improper tire purchases and then use the very problems it created as a basis for saying that it has a greater interest in efficiency of public services than Joiner and Milner have in free speech.
Furthermore, the plaintiffs presented substantial evidence that the speech was a substantial or motivating factor in the challenged employment decisions. Even the mayor of the Town said, both in his deposition and again at trial, that he thought the town council's actions were retaliation for Joiner and Milner's telling about the improper tire purchases.
The trial court did not err in submitting to the jury the plaintiffs' 42 U.S.C. § 1983 claim alleging a violation of their right to free speech. See Wulf; Reeves v. Claiborne County Board of Education, 828 F.2d 1096 (5th Cir.1987); Sykes v. McDowell, 786 F.2d 1098 (11th Cir.1986); Robb v. City of Philadelphia, 733 F.2d 286 (3d Cir.1984); Allen v. Autauga County Board of Education, 685 F.2d 1302 (11th Cir.1982); Kingsville Independent School District v. Cooper, 611 F.2d 1109 (5th Cir. 1980).
We are aware that there are cases that might suggest a contrary result. See Morales v. Stierheim, 848 F.2d 1145 (11th Cir.1988); Cooper v. Johnson, 590 F.2d 559 (4th Cir.1979); Kannisto v. City & County of San Francisco, 541 F.2d 841 (9th Cir. 1976), cert. denied 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); Wood v. Town of Frederica, 529 F.Supp. 403 (D.Del.1982), aff'd at 688 F.2d 828 (3d Cir.1982); Hoopes v. Nacrelli, 512 F.Supp. 363 (E.D.Pa.1981).
The trial court properly submitted the plaintiffs' free speech claim to the jury, but it erred in submitting to the jury their claim for deprivation of property allegedly without due process because of their termination. The jury returned a general verdict. In South Central Bell Tel. Co. v. Branum, 568 So.2d 795 (Ala.1990), we addressed the effect of a general verdict when a case contains a "good" count (i.e., one properly submitted to the jury) and a "bad" count (i.e., one improperly submitted to the jury). In that case, we held that if a good count and a bad count go to the jury *203 and the jury returns a general verdict, this Court cannot presume that the verdict was returned on the good count. 568 So.2d at 798. See also Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981).
Accordingly, the judgment is due to be reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
SHORES, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
INGRAM, J., concurs in the result in part and dissents in part.
INGRAM, Justice (concurring in the result in part and dissenting in part):
In this action, the plaintiffs sued the members of the town council of the Town of Morris, in their official capacity. The plaintiffs alleged that the town council members denied them due process of law and violated their rights to free speech under the first amendment and were therefore liable for damages pursuant to 42 U.S.C. § 1983. The essence of their claim is that the town council members, acting under the color of their office, retaliated against the plaintiffs for speaking out regarding an incident concerning the improper purchase of tires by two councilmen through the town's account. The plaintiffs alleged that the members of the town council terminated them for this "whistle-blowing" activity.
The defendants named in the original complaint were designated as follows:
"EARL PEYTON, individually and in his official capacity as member of the Town Council of Morris, Alabama; GENE CHAMBERS, in his official capacity as member of the Town Council of Morris, Alabama; ED RENO, in his official capacity as member of the Town Council of Morris, Alabama; CHARLIE LOLLAR, in his official capacity as member of the Town Council of Morris, Alabama; LAMAR REID, in his official capacity as Mayor of the Town of Morris, Alabama; and FRANK KEITH, individually and in his capacity as member of the Town Council of Morris, Alabama."
By the time of trial, no council member named in the original complaint was still in office. Under Rule 25(d)(1), A.R.Civ.P., the successors in office to the originally named defendants, who were sued in their official capacity, were automatically substituted.[1]
A suit against the town council and the mayor of the Town of Morris, in their official capacities, is for all intents and purposes an action against the Town of Morris. See Brandon v. Holt, 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878 (1985); Monell v. New York City Department of Social Services, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). In official-capacity suits, such as this one, the plaintiffs seek to impose liability upon the governmental entity that the named defendants represent, here the Town of Morris. In order to recover under § 1983 in an official-capacity suit, the plaintiffs must allege and prove that the entity was a moving force behind the deprivation and that the entity's policy or custom played a part in the violation.
The United States Supreme Court addressed this issue in Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099 (1985). The Court stated:
"On the merits, to establish personal liability in a § 1983 action, it is enough to *204 show that the official, acting under color of state law, caused the deprivation of a federal right. See, e.g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a `"moving force"` behind the deprivation, Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting Monell, supra, 436 U.S., at 694, 98 S.Ct., at 2037); thus, in an official-capacity suit the entity's `policy or custom' must have played a part in the violation of federal law. Monell, supra; Oklahoma City v. Tuttle, 471 U.S. 808, 817-818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); id., at 827-828, 105 S.Ct. at 2437, 2438 (BRENNAN, J., concurring in judgment).*
"* See Monell, 436 U.S., at 694, 98 S.Ct., at 2037 (`[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983')."
Id. at 166 and n. 12, 105 S.Ct. at 3105 n. 12.
The issue in this case is whether the plaintiffs have pleaded and proved a cause of action against the Town of Morris under § 1983. I believe they have not.
To reiterate, in order for a municipality to be found liable under § 1983, the plaintiffs must allege and prove a direct causal link between the municipal policy or custom and the alleged constitutional deprivation. City of Canton, Ohio v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202-03, 103 L.Ed.2d 412 (1989). The plaintiffs must allege and prove that "the `execution of the government's policy or custom ... inflict[ed] the injury.'" Id. (quoting City of Springfield, Mass. v. Kibbe, 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting) (quoting Monell, 436 U.S. at 694, 98 S.Ct. at 2037)).
In the pre-trial order in the present case, the trial court stated:
"Plaintiffs have brought this action under 42 U.S.C. § 1983. Plaintiffs contend that they were illegally and unlawfully discharged as employees of the Town of Morris. They contend that they were discharged, in violation of the personnel policy of the Town of Morris and the Fourteenth Amendment to the Constitution of the United States, as employees of said Town without just cause, and that they were not given a pre-termination hearing, and that they were discharged for exercising their First Amendment rights.
"....
"On oral motion of the plaintiffs, in Open Court, all claims heretofore stated in their complaint which are not set forth herein are hereby dismissed.
"All the claims of the plaintiffs, respectively, are asserted pursuant to 42 U.S.C. § 1983, and the claim for attorney fees is pursuant to [42 U.S.C. § 1988]."
(Emphasis added.)
Further, the following charge was requested by the plaintiffs and was given by the trial court:
"Plaintiffs claim that the Town of Morris violated Section 1983 of Title 42 of the United States Code. That section entitles a person to recover damages against a defendant who, while appearing to act under the authority of law, deprived plaintiff[s] of rights guaranteed by the Constitution."
(Emphasis added.)
Also, the plaintiffs produced no evidence or testimony, nor do they argue, that they were discharged pursuant to some policy or custom of the Town of Morris, nor did they allege that the single event of their discharge constituted a "policy or custom" of the Town of Morris.[2] "The [Town of Morris] *205 cannot be held liable under § 1983 unless [the plaintiffs] prove the existence of an unconstitutional municipal policy." City of St. Louis v. Praprotnik, 485 U.S. 112, 128, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).
In this case, the plaintiffs consistently assert that they were discharged because they had "blown the whistle" on an allegedly improper purchase of tires by two "sitting" councilmen and that their discharge violated the personnel policy of the town. Their claims, under § 1983, arise not from the effectuation of some policy or custom of the Town of Morris; indeed, the plaintiffs allege that their discharge violated the policy of the Town of Morris. This is not sufficient to state a claim against the Town of Morris under § 1983 for deprivation of constitutional rights as a result of the town's policy or custom. Because the plaintiffs have failed to state a claim for relief, under § 1983, against the Town of Morris, and the plaintiffs dismissed with prejudice their claims against those members of the town council who were sued in their individual capacity, there is no ground upon which relief can be granted. Therefore, the verdict of the jury against the current town council members in their official capacities is due to be reversed, and the cause remanded to the trial court for entry of judgment in favor of the defendants. I respectfully dissent from that part of the majority opinion that remands the case to the trial court for retrial of the First Amendment issue, and I concur in the result regarding the alleged denial of due process.
NOTES
[1] Rule 25(d)(1), A.R.Civ.P., states:

"When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party."
The corresponding federal rule has been interpreted in the following manner:
"Should the official die [resign, or otherwise cease to hold office] pending final resolution of a personal-capacity action, the plaintiff would have to pursue his action against the decedent's estate. In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office. See Fed.R.Civ.Proc. 25(d)(1); Fed. R.App.Proc. 43(c)(1); [United States Supreme Court] Rule 40.3."
Kentucky v. Graham, 473 U.S. 159, 166 n. 11, 105 S.Ct. 3099, 3105 n. 11, 87 L.Ed.2d 114 (1985).
[2] A recent United States Supreme Court decision seems to hold that an action may be maintained against a municipality when the highest policy-making authority of the municipality has made a single decision. City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 923-24 (1989). The Supreme Court held that under certain circumstances a single decision could represent the "policy" of the governmental entity. Id. In Praprotnik, the respondent was not successful in alleging a cause of action against the City of St. Louis because he had failed to allege and to prove the existence of an unconstitutional policy, and he had not contended that anyone had ever promulgated such a policy. He also failed to prove that the deprivation of his rights was the "custom" of St. Louis. Id. at 128, 108 S.Ct. at 926.