[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 302 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 303 
Three Jefferson County probation officers, Tom Ford, Michele Wells, and Cynthia Bunton-Welch ("the officers"), appeal from a summary judgment entered against them and in favor of Jefferson County and Jefferson County Juvenile Services by the Jefferson Circuit Court on the officers' claims alleging violations of their First Amendment rights of free speech. We reverse the trial court's judgment.
This is the second time this case has come before us. Initially, the officers filed a civil action on August 18, 1999. They alleged that, after they criticized a certain Jefferson County Juvenile Services program in a signed memorandum directed to John Duke, the director of Jefferson County Juvenile Services, they were subjected to "`retaliatory treatment, including retaliatory transfers from Bessemer to Birmingham, retaliatory job assignments, denial of opportunities for advancement or promotion, singling individuals out, ostracism, and harassment, which has resulted in a hostile work environment.'" Ford v.Jefferson County, 774 So.2d 600, 602 (Ala.Civ.App. 2000). The officers claimed that the defendants' conduct violated their rights of free speech as guaranteed by § 4, Alabama Constitution of 1901; that the defendants' conduct violated their rights of free speech under the First Amendment to the United States Constitution, a violation actionable under 42 U.S.C. § 1983; that the defendants had negligently caused *Page 304 
them to be subjected to harassment and to a hostile work environment; and that the defendants had negligently supervised and/or trained employees, thereby causing the officers to be subjected to retaliation and harassment.
The defendants filed a motion to dismiss all of the officers' claims, which the trial court granted. On appeal, this court treated the defendants' motion as one for a summary judgment. We reversed the trial court's judgment insofar as it pertained to the officers' claims alleging deprivation of their federalFirst Amendment rights of free speech and the officers' demand for injunctive relief as to their claims alleging deprivation of their rights of free speech guaranteed by the state constitution. We remanded the case for the trial court to conduct further proceedings, stating the following with respect to theFirst Amendment claims:
 "[A]t this stage of the case, the defendants have not met their burden of production under Rule 56, Ala. R. Civ. P., as to [whether the officers' speech was not protected under the First Amendment] so as to warrant a summary judgment on the merits of the officers' federal claim. . . . While the evidence may yet reveal that the officers' speech was outside First Amendment protection, the defendants are not entitled to a summary judgment at this time."
Ford, 774 So.2d at 604.
On October 12, 2002, the defendants filed a second motion for a summary judgment. The trial court granted that motion, without explanation, on January 14, 2003. The officers appeal, arguing that the trial court erred in entering a judgment against them on their First Amendment claims.
In reviewing a summary judgment, we apply the same standard as the trial court: A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. See, e.g.,Shows v. Mayfield Oil Co., 743 So.2d 465, 466 (Ala.Civ.App. 1999). The moving party has the burden of making a prima facie showing that the entry of a summary judgment is proper, and, if it does so, the nonmovant must rebut that showing by presenting substantial evidence that a genuine issue of material fact exists in order to avoid a summary judgment being entered against the nonmovant. Id. In addition, our review of a summary judgment "is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant." Ex parte Harris,837 So.2d 283, 286 (Ala. 2002) (citing Hanners v. Balfour Guthrie,Inc., 564 So.2d 412, 413 (Ala. 1990)).
The circumstances from which this lawsuit arose are as follows. The officers were informed by their superiors that participation in the Jefferson County Family Court's "Operations Nighttime Crime Eradicators Program" ("the ONCE program") would be mandatory for all Jefferson County probation officers. ONCE is a program that provides nighttime visits to minors by juvenile probation officers while accompanied by a police officer. The goal of the program is to decrease juvenile crime by facilitating a partnership between law-enforcement personnel and probation officers to monitor at-risk juveniles. The ONCE program began in August 1997 as a voluntary program with 10 participating probation officers. The program was deemed a success when shooting incidents and curfew violations involving juveniles declined after its implementation.
On July 15, 1998, Duke circulated a memorandum informing Jefferson County *Page 305 
probation officers that participation in the ONCE program was becoming mandatory in both the Birmingham and Bessemer divisions of the Jefferson County Family Court. The memorandum invited probation officers to meet with Duke regarding any concerns about the program. Bunton-Welch testified in her deposition, however, that when she asked Duke if she could talk to him about her concerns, Duke told her to put her concerns in writing.
On August 7, 1998, Ford, Wells, Bunton-Welch, and seven other probation officers signed a memorandum directed to Duke, a copy of which was sent to Mal Hutchins, the Jefferson County Family Court administrator and chief probation officer, outlining their concerns about making participation in the ONCE program mandatory. Because the officers' free-speech claims stem directly from what was stated in the August 7, 1998, memorandum, we set out the pertinent contents of the memorandum:
 "We as a group have serious concerns and issues that we feel have not been properly addressed due to the manner in which this program has been implemented. We have not received anything concrete regarding the issues of liability, adequate compensation, training, and loss of credibility with the community. Nor has there been any substantial information given regarding the basic structure of the program.
 "In the past we have had the utmost respect for the administration, Judiciary and the County Commission as our employer. However, in light of the decision that was made mandating participation in this program, it would seem that our livelihood, families and even lives have not been considered or valued. Especially, since there has been no research proving the effectiveness of this pilot program. Nor does the implementation of the program here adopt or encompass the intricate community involvement which has contributed to the success of the base program in Boston.
 "It appears there has not been much forethought given to the issue of liability in regards to both our lives and families as well as the lives of our clients. For instance, is the County, Judiciary, and/or the administration liable should a Probation officer be killed during participation in this program? Or can a Probation Officer be held liable in the event a child is hurt or killed? Will our families be adequately compensated and taken care of should this program lead to one of our demise?
 "We are not law enforcement per se and do not wish to be identified as such. Juvenile Probation Officers in the past have always been viewed as separate and distinct from law enforcement. Our fear is that when the communities start associating us with the local law enforcement, we will lose credibility and rapport with our kids.
 "Current participants speak of `kicking in doors,' participating in the harassment of citizens, conducting searches on people with no apparent probable cause, seeing a group of `23 year-olds' and responding by cutting off the police vehicle lights, driving up to the group and jumping out of the car to surprise the group, wearing law enforcement emblems on tee shirts and personally carrying badges. These examples of behavior that are apparently encouraged within the ONCE project can only incite the community[,] causing poor relation[s] between Juvenile Probation Officers that actually do home visits during the day with their clients without police protection. We do not feel this is appropriate juvenile probation practice and does not have a place in the Court's mission. *Page 306 
 "Law enforcement officials are required to attend intensive academy training and are aware that `hazard duty' is within the scope of their employment. Additionally, they are allowed to carry weapons for their protection. Juvenile Probation Officers are not privy to such training, are not allowed to carry weapons and hazard duty is not within our job description. In fact, the only protection and training we are given is the bullet-proof vest and limited training on police protocol. This is far different from our Federal and state counterparts who are allowed to carry weapons, have authority to arrest, receive hazard duty compensation and have twenty-five year retirement. If indeed, it is inappropriate or prohibited for Juvenile Probation Officers to be involved in law enforcement activities, such as executing warrants, carrying weapons, etc., then are we not being placed in a conflicting role by pairing us with law enforcement?
 "We are appealing to you, Mr. Duke, since it is your direct order requiring our involvement in this program. Under your authority as Provisional Principal Probation Officer, we suggest that outside of the liability, you also have an obligation to be fair, just and to ensure the safety of the employees you directly impact by your decisions. We do not think it is asking a great deal of you to clarify these issues since there is much at stake here for us as well as our families and the communities that we serve. We are certain that we can depend upon your cooperation, as we have in the past, in this matter to re-evaluate your decision and supply us with the information we requested."
In response to the memorandum, the officers' superiors, including Duke and Hutchins, conducted a meeting with all of the participants of the ONCE program and discussed the issues in the officers' memorandum with the program participants. A second meeting was then held with the signatories of the memorandum. According to a written grievance subsequently filed by Ford and Wells, Hutchins stated in the latter meeting that he considered the officers' memorandum to be a personal attack on him.
In the wake of the foregoing, the ONCE program was returned to being a voluntary program.
Ford, Wells, Bunton-Welch, and others who signed the memorandum directed to Duke were transferred in November 1998. Bunton-Welch was transferred from the Birmingham field office to the Bessemer intake office of the Jefferson County Family Court, while Ford and Wells were transferred from the Bessemer office to the Birmingham office of the Jefferson County Family Court; Ford and Wells filed a grievance complaining about their transfers. The defendants claimed that the transfers were made, among other reasons, because there was a need to establish the ONCE program in Bessemer and because the court needed probation officers who were willing to volunteer for the ONCE program to be stationed in Bessemer. The officers contend that they were transferred because they had complained about the ONCE program in the memorandum directed to Duke.
Bunton-Welch claimed that she attempted to volunteer for the ONCE program but that she was not allowed to participate in the program because, she was told, she had signed the memorandum. She also claimed that after she signed the memorandum her workload increased to the point that she could not handle the work and that she was denied the opportunity to interview for a promotion in January 2000, though she was on a list of candidates *Page 307 
authorized by the personnel board to be considered for the promotion.
The record also contains testimony indicating that, after the memorandum to Duke was submitted, the officers who signed the memorandum were not considered for promotions, were harassed and "blackballed" by superiors, were "labeled as bad people," and that co-employees were told not to associate with them. The officers alleged that those actions were in retaliation for the officers' submission of the memorandum critical of the ONCE program to their superiors and that those actions violated theirFirst Amendment rights of free speech.
It has been settled since 1967 that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interests in freedom of speech.Keyishian v. Board of Regents, 385 U.S. 589, 605-06,87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Pickering v. Board of Education,391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and Connickv. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Our task in a case in which a public employee alleges that his free-speech rights have been infringed by the state is to seek a balance between the interest of the employee in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs. Based on the vital nature of the public services at issue in this case, the specific content of the speech at issue, and the manner and circumstances of the speech at issue, we conclude that the trial court in the present case misapplied the applicable standard and erred in striking the balance in favor of the state.
Our consideration of this case must be based upon what has been described as a four-stage analysis:
 "Since the Pickering [v. Board of Educ., 391 U.S. 563 (1968),] decision, a four-stage analysis has evolved for examining these types of cases involving a public employee's exercise of First Amendment rights. At the first stage, the trial judge must determine the threshold legal question of whether the employee's speech may be `fairly characterized as constituting speech on a matter of public concern.' Rankin [v. McPherson], 483 U.S. [378,] at 384, 107 S.Ct. 2891 [(1987)] (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708
(1983)). This involves an examination of the content, form, and context of the speech. Rankin, 483 U.S. at 384-85, 107 S.Ct. 2891. If that threshold is established, the trial judge proceeds to the second stage and applies the Pickering balancing test, weighing the interests of the public employee against the interest of the public employer, again considering the context and circumstances of the employee's speech. Id. at 388, 107 S.Ct. 2891."
Brochu v. City of Riviera Beach, 304 F.3d 1144, 1157 (11th Cir. 2002) (footnote omitted). Specifically, the second "stage" or prong of what may be referred to as the "Pickering-Connick
test" adopted by the United States Supreme Court is whether the speaker's
 "First Amendment interests in commenting on matters of public concern . . . outweigh the government's interests, `"as an employer, in promoting the efficiency of the public services it performs through its employees."' Connick [v. Myers], 461 U.S. [138,] at 142, 103 S.Ct. [1684,] at 1687 [(1983)] (quoting Pickering [v. Board of Educ.], 391 U.S. [563,] at 568, 88 S.Ct. [1731,] at 1734 [(1968)])." *Page 308 Maggio v. Sipple, 211 F.3d 1346, 1351 (11th Cir. 2000).
 "Only if [the first] two stages are satisfied does the matter go to the fact-finder, i.e., the jury, for a determination of whether the speech which the court has identified as protected played a substantial part in the employment decision. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If so, then the employer must prove that it would have reached the same decision `even in the absence of the protected [speech].' Id. This fourth stage is sometimes called the `but for' test. To satisfy this test, the employer must show that `its legitimate reason, standing alone, would have induced it to make the same decision.' Price Waterhouse v. Hopkins, 490 U.S. 228, 252, 109 S.Ct. 1775, 104 L.Ed.2d 268
(1989)."
Brochu, 304 F.3d at 1157.
The determination of whether a public employee's speech may be "fairly characterized as constituting speech on a matter of public concern" and, if so, the balancing of the employee's right to engage in that speech against the employer's interest in the efficient and effective functioning of its office are issues of law, subject to de novo review. See, e.g., Beckwith v. City ofDaytona Beach Shores, 58 F.3d 1554 (11th Cir. 1995); andRoberts v. Joiner, 590 So.2d 195 (Ala. 1991). If these two inquiries are answered in the employee's favor, the inquiry them turns to the issue of the employer's motivation, which is a question of fact. See, e.g., Beckwith, 58 F.3d at 1560;Roberts, 590 So.2d 195; and Todd v. Kelley, 783 So.2d 31
(Ala.Civ.App. 2000).
Thus, we must first determine whether the officers' speech may be "`fairly characterized as constituting speech on a matter of public concern.'" Rankin v. McPherson, 483 U.S. 378, 384,107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting Connick v. Myers,461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Matters of public concern generally include "any matter of political, social, or other concern to the community. . . ."Connick, 461 U.S. at 146, 103 S.Ct. 1684. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick,461 U.S. at 147-48, 103 S.Ct. 1684 (footnote omitted).
In this case, the officers' speech was communicated in the form of a written memorandum and was distributed to their superiors. Thus, the statements made by the officers were not broadcast to the general public. The defendants argue that the relatively private nature of the officers' communication precludes the speech from being considered a matter of public concern. The officers correctly point out, however, that the United States Supreme Court has not adopted such a strict view.
 "The First Amendment forbids abridgment of the `freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."
Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410,415-16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). "The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern." Rankin,483 U.S. at 387 n. 11, 107 S.Ct. 2891. As the Rankin Court noted, "[A] purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee." Rankin, *Page 309 483 U.S. at 388 n. 13, 107 S.Ct. 2891. Likewise, the Supreme Court of Alabama, in Roberts v. Joiner, 590 So.2d 195, held that statements made by two police officers to a mayor concerning certain town council members was a matter of public concern, even though the statements were not made public or directed toward the public. 590 So.2d 195. See also Todd v. Kelley, 783 So.2d 31
(holding that statements made only to supervisor and chief by police officer were matters of public concern).
More important than the number of people to whom the message was communicated is the content of the message, at least under the circumstances presented in this case.
 "The First Amendment `was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United States, 354 U.S. 476, 484
(1957); New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). `[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the `"highest rung of the hierarchy of First Amendment values,"' and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982); Carey v. Brown, 447 U.S. 455, 467 (1980).
 "Pickering v. Board of Education, [391 U.S. 563
(1968)], followed from this understanding of the First Amendment. In Pickering, the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue. Pickering's subject was `a matter of legitimate public concern' upon which `free and open debate is vital to informed decision-making by the electorate.' 391 U.S., at 571-572."
Connick v. Myers, 461 U.S. at 145, 103 S.Ct. 1684.
In Givhan v. Western Line Consolidated School District,439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619, a teacher claimed she was discharged for exercising her free-speech rights by criticizing the school's desegregation efforts. The United States Supreme Court held the remarks to be on a matter of public concern.
In Roberts v. Joiner, 590 So.2d 195, a chief of police and a sergeant in a town's police department alleged that they were subjected to retaliatory treatment for exercising their free-speech rights when they informed the town's mayor that two town council members had purchased tires for their personal use through the town's account. The council members had paid for the tires, but they had received the tires at a substantially discounted price by using the town's account. Our Supreme Court determined the police officers' statements to be a matter of public concern.
In Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, the plaintiff complained that the termination of his employment as fire chief of the City of Daytona Beach Shores violated hisFirst Amendment rights of free speech. In addition to the plaintiff's publicly expressed opposition to budget-cutting proposals by the mayor of the City, the plaintiff had publicly expressed opposition to the City's public-safety-officer program ("the PSO program"), *Page 310 
a program that encouraged police officers, firefighters, and paramedics to cross train and serve in other roles. Although the City did not argue that the plaintiff's opposition to reducing the number of paramedics and to the PSO program was not protected by the First Amendment, the United States Court of Appeals for the Eleventh Circuit nonetheless noted that the record supported the conclusion that the plaintiff's speech was protected, explaining:
 "[The plaintiff's] speech concerns political matters at the core of activity protected by the First Amendment. See generally McIntyre v. Ohio Elections Comm'n, [514] U.S. [334, 346], 115 S.Ct. 1511, 1518-19, 131 L.Ed.2d 426 (1995) (explaining that speech on public issues `occupies the core of the protection afforded by the First Amendment'). Few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services. It is hard to imagine any combination of government interests sufficient to outweigh [the plaintiff's] strong interest in informing the public about policies he believed were dangerous to the City's citizens."
58 F.3d at 1564.
On the other hand, in Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993), an employee claimed she was subjected to retaliatory treatment after she filed a complaint alleging sexual harassment in the workplace. The Eleventh Circuit Court of Appeals found that the complaint did not address a matter of public concern. Likewise, in Long v. Water Works Sewer Board of Gadsden,487 So.2d 931 (Ala.Civ.App. 1986), a meter reader employed by the Gadsden Water Works and Sewer Board alleged that he was discharged for exercising his free-speech rights when he complained to his supervisor about being ordered to work in the rain; the Board's rules and regulations required meter readers to work in the rain only during emergencies. The meter reader alleged that he told his supervisor that he was going to get his union representative to file a grievance against the supervisor and that he was discharged as a result of making those remarks. This court found that the remarks did not touch on a matter of public concern.
It is clear that the officers' memorandum in the present case touches both on issues relating to the officers' welfare and on substantive issues of public concern. The fact that the officers' memorandum does not exclusively address matters of public concern does not mean that the officers have failed to demonstrate that they made statements satisfying the public-concern prong of the four-stage analysis that has been applied since Pickering.
Indeed, in Connick, the United States Supreme Court addressed a questionnaire consisting of 14 questions from an employee to her co-employees regarding working conditions and reasoned that "[b]ecause one of the questions in [the plaintiff's] survey touched upon a matter of public concern and contributed to her discharge, we must determine whether [the defendant] was justified in discharging [the plaintiff]," 461 U.S. at 149,103 S.Ct. 1684. The Court proceeded to apply the second prong of thePickering test, balancing the employee's interest in free speech with the government's interest in the effective and efficient fulfillment of its responsibilities.
Because of the nature of the issues of public concern that are raised in the officers' memorandum in this case, we conclude that this case is more closely aligned with those cases discussed above in which our Supreme Court and the United States Supreme Court have held the speech at issue to be a matter of public concern. We note that the officers' memorandum concerned *Page 311 
the operation of Jefferson County Juvenile Services, the safe and effective functioning of which is obviously a matter of significant public concern. Thus, even issues such as the personal safety of the probation officers and the liability for the injury or death of a probation officer while engaged in his or her duties would be significant public concerns insofar as they relate to the ability of Jefferson County Juvenile Services to recruit and retain qualified employees and to continue to effectively perform its functions.
Moreover, the officers' memorandum addressed the following issues of even more direct public concern: (1) whether the association with law-enforcement personnel would cause the probation officers to lose credibility with their probationers and with the communities in which they must work; (2) that current employees participating in the ONCE program had kicked in doors and had participated in the harassment of citizens; (3) that participants in the ONCE program were conducting searches on people without probable cause; and (4) whether the probation officers participating in the ONCE program could validly exercise law-enforcement authority, including executing warrants and making arrests. These are questions of such interest to the community that it is essential that the public employees in this case — the officers — be able to speak out freely without fear of retaliation.
Under the Pickering-Connick test, once it has been determined that the speech at issue addresses matters of public concern, the court must balance the plaintiffs' interest in making the statement against the interest of the state, as an employer, in promoting the effective and efficient fulfillment of its responsibilities to the public. As to this second prong, we begin by noting that our appellate courts have recognized that the reporting of misconduct by government employees outweighs a municipality's interest in efficient public service. See Robertsv. Joiner, 590 So.2d at 201; and Todd v. Kelley, 783 So.2d 31.See also, e.g., Cooper v. Smith, 89 F.3d 761 (11th Cir. 1996); and Oladeinde v. City of Birmingham, 963 F.2d 1481 (11th Cir. 1992).
We also note that, in performing the balancing test required by the second prong of the Pickering-Connick test, the manner, time, and place of the employee's statement is relevant. In contrast to the circumstances in Connick, Bunton-Welch was told by her supervisor, John Duke, to put her concerns regarding mandatory participation in the ONCE program in writing. Duke testified that Bunton-Welch asked if a group of officers could put their concerns in writing:
 "A. I responded by saying something to the effect of, good, I think people have the right to express themselves in writing, want to hear what you have to say, that's perfectly fine.
 "Q. Then you knew what she was asking about were complaints about the [ONCE program]?
"A. Oh, absolutely."
The evidence indicates that Duke solicited the communication by the officers of their concerns. This is entirely different from the circumstances surrounding the unsolicited and disruptive circulation of a questionnaire to fellow employees by the plaintiff in Connick.
In Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891,97 L.Ed.2d 315, the United States Supreme Court explained that the balancing test at issue focuses on the effective functioning of the public employer's enterprise and whether the speech at issue interferes with the work of the employer, personnel relationships, or the speaker's job performance and thus detracts from *Page 312 
the public employer's function. 483 U.S. at 388, 107 S.Ct. 2891. In that case, the Supreme Court noted that the employer failed to demonstrate a state interest that outweighed the employee'sFirst Amendment right of free speech, because there was insufficient evidence that the speech at issue interfered with the efficient functioning of the employer's office. Likewise, there was no danger that the employee had discredited the employer by making her statement in public. Rankin, 483 U.S. at 388-89,107 S.Ct. 2891.
Similarly, there is not substantial evidence in the present case that the officers' memorandum interfered with the efficient functioning of Jefferson County Juvenile Services. Further, the speech at issue was not made public.
Indeed, not only is it difficult to see how the officers' memorandum interfered with the efficient and effective fulfillment of their employer's function, much of the speech contained in the memorandum sought the resolution of issues that had the potential to improve the effectiveness of Jefferson County Juvenile Services. The officers make the following argument in their brief to this court:
 "[W]hether probation officers should be involved with police so that they are regarded as law enforcement by the community, and therefore negatively impacting the position of probation officer, is a significant public concern. Without respectful input by those in the field, the provision of governmental services could become . . . inefficient, and even counterproductive."
In addition, the officers note that the memorandum called their employer's attention to the fact that by law probation officers serve in the position of "intake officers" and should not be associated with activities of law enforcement because it affects their neutrality.
We conclude that there is much merit to the officers' arguments, cf. Fikes v. City of Daphne, 79 F.3d 1079 (11th Cir. 1996) (holding that attempts to disclose government employee misconduct has been held to further governmental efficiency, meeting the governmental employer's responsibility to provide effective services), and that the officers have satisfied the second prong of the Pickering-Connick test.
Having determined that the officers' speech was protected, we turn our attention to the third and fourth prongs of thePickering-Connick test which, together, are designed to address the factual question whether a retaliatory motive was the cause of the challenged action of the employer. As the Eleventh Circuit Court of Appeals has explained:
 "To get before the jury, [the plaintiff] had to present enough evidence for a reasonable jury to conclude that his protected speech was a `substantial' motivating factor in the decision to terminate him. [The defendants] could still avoid liability, however, by convincing the jury that [the plaintiff] would have been terminated in the absence of First Amendment protected activity. See Mt. Healthy [City School Dist. Bd. of Educ. v. Doyle], 429 U.S. [274,] at 287, 97 S.Ct. [568,] at 576 [(1977)]; Tindal [v. Montgomery County Comm'n], 32 F.3d [1535,] at 1540 [(11th Cir. 1994)]; Bryson [v. City of Waycross], 888 F.2d [1562,] at 1565 [(11th Cir. 1989)]. Nevertheless, if [the plaintiff] produced enough evidence for a reasonable jury to conclude that a retaliatory animus substantially motivated his termination, [the defendants] could only rebut this showing by convincing the jury, not the court, that a legitimate reason justified the decision. See Pullman-Standard [v. Swint], 456 U.S. [273,] at 289-90, 102 S.Ct. [1781,] at 1790-91[, *Page 313 72 L.Ed.2d 66] [(1982)] (holding that issues of discriminatory intent and actual motivation are questions of fact for the trier of fact); Bell v. Birmingham Linen Service, 715 F.2d 1552, 1557 (11th Cir. 1983) (`Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor.'), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984)."
Beckwith, 58 F.3d at 1564. See also Roberts v. Joiner,590 So.2d 195.
In Beckwith, the Eleventh Circuit Court of Appeals further explained:
 "It is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a `substantial' or `motivating factor' behind a government employment decision. See Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576. Nevertheless, Waters v. Churchill, [511] U.S. [661], 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), suggests that an employee's burden is not a heavy one. In Waters, Churchill brought a § 1983 claim against a state hospital alleging that her termination was in retaliation for protected speech. Id. at [665]-[667], 114 S.Ct. at 1882-83. Briefly addressing the intent issue, the Court concluded that a material issue of fact was created by evidence of Churchill's criticism of hospital policy, evidence of management `sensitivity' about the criticisms, and evidence of conduct that, viewed in the light most favorable to the plaintiff, showed management hostility because of the criticisms. Id. at [681-82], 114 S.Ct. at 1891 (citing Churchill v. Waters, 977 F.2d 1114, 1125-26 (7th Cir. 1992)). The Court relied on a sudden drop in Churchill's performance evaluations, criticism of her relationship with a doctor, and a supervisor's unusual ordering of Churchill out of an operating room as significant evidence of management hostility. Id. at [681-82], 114 S.Ct. at 1891 (citing Churchill, 977 F.2d at 1125-26). Thus, purely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue of the government's motive."
58 F.3d at 1564-65 (footnote omitted).
Among other things, Ford, Wells, and Bunton-Welch have testified that they have been transferred in retaliation for signing the memorandum directed to Duke. Transfers and similar adverse "job actions" resulting from a public employee's exercising his or her rights of free speech are prohibited by theFirst Amendment when the speech at issue is deemed to be protected speech. See, e.g., Bernheim v. Litt, 79 F.3d 318 (2nd Cir. 1996). Cf. Rutan v. Republican Party of Illinois,497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).
We do not find it necessary to review at this juncture all of the other evidence supporting the officers' position that their signing the memorandum at issue resulted in their transfers and in other adverse consequences. Those consequences and the evidence as to their causation are reviewed in large part at the beginning of this opinion. Suffice it to say that at this juncture we have reviewed the record in this case and have determined that there is substantial evidence, that is, evidence creating a genuine issue of fact, as to whether the officers' exercise of their free-speech rights was a substantial motivating factor in their employer's decision to transfer the officers and to subject the officers to other adverse consequences. The officers therefore *Page 314 
have made the showing necessary to avoid summary judgment in this case.
The summary judgment entered by the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur in the result, without writing.